**A. C. WALTERS, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant in Error.**

**No. A-14967.**

Court of Criminal Appeals of Oklahoma.

May 21, 1969.

Wilson Smithen and McElroy & Vaughn, Chickasha, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Dale F. Crowder, Phil R. Scott, Asst. Attys. Gen., for defendant in error.

BUSSEY, Judge.

On the early, Sunday morning of October 7, 1962, James R. Chaney awoke, talked on the telephone and appeared to be in a calm frame of mind as he dressed and left his home in his automobile. He drove to the home of his brother-in-law, James Vernon Davis, where he had breakfast with the Davis family, drank some coffee and left in the company of Davis, who also appeared to be calm and in a good frame of mind. Neither of these men had any weapons with them when they left home. They drove together to the home of Dewey Avon Davis and awoke him where, after dressing, the two Davis brothers drove away in the Dewey Avon Davis car, followed by James R. Chaney in his automobile, and they apparently drove to the home of A. C. Walters, defendant herein. The Davis car was parked in front of the A. C. Walters' farm residence on the east side of the road and the Chaney car was parked immediately behind it, facing in the same direction. Several of the neighbors of A. C. Walters heard five gunshot blasts occurring in a sequence of three rapid shots with an interval, and two shots thereafter. A passing motorist drove in front of the Walters' residence and observed a man bending over the bodies of two men in the roadway in front of the Walters' residence. This motorist heard noises and it appeared as if the man standing in the road was doing something to the bodies. The motorist then proceeded to the Barbee residence, where she called the sheriff of Grady County. This witness and others, went to the front porch where they observed A. C. Walters in the road, bending over the bodies and watched him leave the roadway, enter his home and a short time thereafter return to the vicinity of the bodies in the roadway, where they again heard noises. Walters remained there a short period of time and walked south, past the Davis and Chaney cars, to a point some 100 yards in the center of the roadway, where he slumped on the ground and remained until Sheriff Emmett Watson and Deputy Sheriff Don Cerlock found him and placed him under arrest.

Upon receiving the call from the Barbee home, Sheriff Watson called Deputy Cerlock. The two men left and proceeded to the A. C. Walters' home at a high rate of speed, arriving there about fifteen minutes later. Upon arriving at the scene, Sheriff Watson parked his automobile, walked past the bodies of the Davis boys in a southerly direction, where the defendant was seated in the middle of the road, pounding a rock with his hands, apparently unaware of the sheriff's arrival. The sheriff placed his hand on the defendant's shoulder and the defendant asked him to help him find his (the defendant's) wife. Thereafter, the defendant was handcuffed and taken into custody.

Witness Teague testified at the trial that he heard the defendant say to the sheriff, "Emmett, if you will get me out of this I will give you my automobile." The sheriff testified that he had not heard the defendant make the statement concerning the automobile, but acknowledged that at this point other people were arriving and the defendant could have made the statement without him hearing it. The defendant was placed in LeRoy Goyne's car and Goyne and Cerlock took him to the county jail in Chickasha. The sheriff testified, in substance, that at the scene of the homicides the Davis car was parked on the east side of the road, headed north and the Chaney car was parked immediately behind the Davis car on the east side of the

road, headed in the same direction and that the automobile belonging to A. C. Walters was parked on the east side of the road headed south in front of the Davis car; that between the Davis car and defendant Walters' car were the bodies of the two Davis brothers, within three or four feet of the bodies was a Browning automatic shotgun laying on the ground between the defendant's car and the Davis car; three expended shotgun shells were found on the road, near the open door of the Walters' vehicle, and two expended shotgun shells were found on the front seat of the Walters' car. The sheriff further testified that the road condition on that day was that of gravel and soft sand and that he observed footprints from the Chaney vehicle near the driver's side, leading in a westerly direction across the road to the body of Chaney, which was hanging on a barb wire fence on the other side of the bar ditch.

The telephone operator testified that she received a call from the A. C. Walters' residence, for Wilson Smithen on the early morning of October 7, 1962, but that when she got Smithen on the line, the telephone in the Walters' home was apparently off the hook. The witness who had first notified the sheriff from the Barbee residence, became impatient for the sheriff's arrival and attempted to place a call to the sheriff a few minutes after the first call, but was unable to complete the call because the Barbee phone was on an 8-party line, one of which was a telephone in the A. C. Walters' residence. Sheriff Watson testified that he entered the Walters' home the morning of the investigation and found the telephone receiver off the hook.

Upon removing the Davis bodies from the scene, an opened three-inch pocket knife was found between and beneath them. This was covered with sand, dirt and substance. A closed three-inch knife was found in the pocket of one of the deceased Davis. The autopsy performed upon Chaney reflected that he had been mortally wounded from shotgun pellets in the back of his head and neck and that multiple injuries had been sustained from shotgun pellets which pierced his lungs, liver and other vital organs, causing bleeding which could produce death. These wounds were all in the back portion of the body. The cause of death of Dewey A. Davis, while not allowed by the court to be elaborated on in detail, was that he had received shotgun pellets largely confined to the right shoulder and chest and back of the head; Vernon Davis had a wide spread concentration of holes on the right side of his body from the shoulder to the head and a few in the neck. He also had one large vertical incision that extended from about the midportion of the chest down close to the navel, which could only have been caused by a sharp instrument. The testimony of other State witnesses was merely cumulative in substance and will not be set forth.

The defendant and his wife testified in his behalf in considerable detail about his mental and emotional condition several months preceding the homicides and were in substance that he was subject to attacks of blindness, heard noises and voices, and was unable to properly attend to his business. They further testified he was unable to sleep and had slept very little a week preceding the slayings and further that he was erratic in his working habits, sometimes working all night. It was their testimony that during this period of time he had illicit relationships with one Bonnie Terry, sister of the deceased Davis boys and sister-in-law of James R. Chaney. They testified that Bonnie threatened to tell defendant's wife of the affair and that the defendant advised his wife of this. The defendant testified that Bonnie attempted to extort money from him and Mrs. Walters related that she had gone to the home of Bonnie one evening prior to the slayings and stabbed her with a knife, for which injury the said Bonnie was hospitalized. The defendant related threats allegedly communicated to him by the Davis brothers, wherein they made threats against his person and that of his wife, if

he did not pay Bonnie's hospital bill and other money to satisfy her. The defendant testified that he had been out all Saturday night, October 6th, in different bars and driving around and that prior to returning home he called an Oklahoma City detective to seek his help in locating his wife. After completing this call, the defendant testified he returned to his home where he parked his automobile on the east side of the road in front of his home, remained in the vicinity of the car a few minutes and went into the house and returned to the road a few minutes later where he sat beside the car; that he was so seated when the Davis car came up with its lights on, followed by another car whose lights were turned off. He further testified that the two Davis boys, together with the third man, were advancing on him and that the two Davis boys were brandishing knives and threatening him; that he ran to the car and secured his shotgun which the three men tried to take away from him, and that he was fearful for his life. The defendant denied any remembrance of the slayings or placing the telephone call to his attorney. He stated he did not remember making any statement to the sheriff and that he first regained his memory in Central State Griffin Memorial Hospital in Norman, Oklahoma, some time later after being confined there under court order.

Mr. Wilson Smithen testified that he went to the A. C. Walters' home after the telephone operator had contacted him; that when he arrived the sheriff, Don Cerlock and LeRoy Goynes were at the scene; that he tried to talk to the defendant as they were putting him in the car to take him to jail, but was never able to communicate with him. He further testified that he followed the sheriff as he made his investigation of the scene; that the Walters car was approximately 10 to 15 feet from the Davis car and that the Chaney car was approximately three feet to the rear of the Davis car. He stated that he saw two opened knives, about 3 to 4 inches in length, and that these knives were laying on the ground under or between the two bodies. He testified at the time of his arrival he did not see Mr. Teague present and that although he remained at the scene some length of time, he never saw Teague present. He stated that the five shotgun shells were on the ground outside the car, in contradiction of the sheriff's testimony that there were three shells on the ground and two inside the car. He further testified that Sheriff Watson had not seen the body of Chaney until he (Smithen) called the sheriff's attention to it. He stated that the distance between defendant's automobile and the location of Chaney's body on the fence was twenty steps. This witness accompanied the sheriff into Walters' home, where he observed the telephone to be off the hook. He testified to observing the defendant in the county jail in his flooded cell, with a hanger about his neck and that he was incoherent at that time and that he (Smithen) was unable to communicate with him.

The testimony of defendant's deceased mother was admitted into evidence and she testified to threats made against A. C. Walters and communicated to him by her.

The testimony of the doctor called to defendant's jail cell on October 7, 1962, was that the defendant was incoherent and pacing about the jail cell until, with the aid of the defendant's wife, they were able to get him near enough to the doctor where he could be given a shot.

The testimony of Dr. Ernest Shadid was that when the defendant was committed for 90 day observation he (Dr. Shadid) was of the opinion that defendant was suffering from Schizophrenia, Undifferentiated Type, and at that time did not know the difference between right and wrong and would not be able to assist in the preparation of his defense.

Other witnesses were offered by defense and their testimony was either cumulative or related to the good reputation of the defendant in the community in which he lived.

The sequence of events leading up to this appeal, are as follows:

1. After being placed in the county jail on October 7, 1962, on the same day the defendant was committed to Griffin Memorial State Hospital in Norman, Oklahoma, for 90 days observation on applicacation of the County Attorney.

2. On November 7, 1962, defendant was returned from Norman to the county jail, certified as incapable of distinguishing between right and wrong, and not being able to help in his defense.

3. On November 19, 1962, defendant was recommitted to Griffin Memorial State Hospital in Norman, Oklahoma, for treatment of his mental illness.

4. On August 28, 1964, defendant was returned to the county jail from the hospital, certified as capable of standing trial.

5. On October 1st and 2nd, 1964, preliminary hearing was conducted on all three charges of murder and defendant was bound over in Case No. 4147 (the murder of James R. Chaney).

6. On November 10, 1964, defendant was brought to trial in Case No. 4147; the District Judge died, and a mistrial was declared.

7. On February 1, 1965, defendant was again brought to trial in Case No. 4147.

8. On February 7, 1965, jury disagreed eleven to one and a mistrial was declared.

9. On February 17, 1965, defendant was returned to Norman for 90 days observation on application of his attorneys.

10. On May 18, 1965, defendant returned to Grady County jail certified incapable of distinguishing right from wrong.

11. On May 21, 1965, defendant was recommitted to the hospital on application of his attorneys for treatment of his mental illness.

12. On December 5, 1967, defendant was returned to Grady County jail certified as capable of standing trial.

13. The case came on for trial by jury on March 25, 1968, and on March 29, 1968, the jury returned a verdict finding the defendant guilty of First Degree Manslaughter of James R. Chaney, and assessed his punishment at imprisonment in the state penitentiary for a term of 99 years.

A. C. Walters, referred to in this opinion as defendant, first contends that the trial court erred in refusing to grant a dismissal of this case on defendant's Motion for Dismissal, for the reason that he was not brought to trial during the July, 1967 term of court, but instead was brought to trial during the January, 1968 term. He asserts that the dismissal is required under the provisions of Article II, Section 20 of the Oklahoma Constitution, the pertinent part of which is as follows:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed * * *,"

and 22 O.S. § 812, the same providing:

"If a defendant, prosecuted for a public offense, whose trial has not been postponed upon his application, is not brought to trial at the next term of court in which the indictment or information is triable after it is filed, the court must order the prosecution to be dismissed, unless good cause to the contrary be shown."

Significantly, the defendant does not argue that he was denied any right relating to a speedy trial prior to his being declared sane and capable of assisting in his own defense on December 5, 1967, by the officials of the mental institution, leaving only 26 days remaining in the July, 1967 term. We must assume that had the defendant been declared sane and capable of standing trial on the 30th day of December, 1967, the same argument would be urged on appeal.

We think it is further significant that as reflected in the record on the hearing on the Motion to Dismiss, the trial court stated that this case was set on the docket for trial in January and he intended to hear it on that date and the record further

reflects that the State stated that it was ready for trial on that date. In response to this, Mr. Smithen replied:

"We have told the Court, the Court has agreed a time or two about when to consider this. We have stated that the Court could decide what he wanted to do; that we wouldn't be placed in a position of asking for one. We were agreeable with the Court and with the prosecution as to any date that was reasonable to the two of us, but we filed no motion for a continuance, and requested no continuance." CM 27, Vol. I.

We are of the opinion that the reference "for good cause shown" as used in 22 O.S. § 812, supra, is broad enough to include the situation here presented. It is apparent to this writer that a jury panel could not have been called, a jury selected, the parties afforded a sufficient length of time to prepare for the prosecution and defense of this case, within the balance of the term time. Indeed, the 779 page record reflects that several of the witnesses, important to the State and defense, were not available to testify when the case was tried in March, 1968, by reason of being out of state, death, etc., and that although due diligence was shown, the presence of the living witnesses could not be secured and it became necessary to use their testimony taken at the previous trial.

■ To summarize our holding on this issue, we are of the opinion that when a defendant, in a capital case, has been committed to a mental institution and is by that institution declared to be sane only 26 days prior to the expiration of that term of court, and it is readily apparent that a jury panel cannot be summoned and the respective parties given adequate time to prepare for trial, the trial court has good cause for not setting the case for trial within the term and may set the cause for trial within the next term. Particularly is this true when counsel has not requested a "speedy trial" but has discussed setting the case for trial at a time convenient for the respective parties and the court.

It is next contended "that the trial court erred in not quashing the entire jury panel for the reason that the same was not drawn in the manner provided by the laws and statutes of the State of Oklahoma."

From the record it appears that some of the prospective jury panel drawn were known to be either deceased, living out of the county, or otherwise disqualified to serve, and that the trial court directed that they not be summoned as jurors and other names were drawn in their places. The defendant asserts in his brief, as follows:

"We took the position that the court had no discretionary powers in drawing the names from the jury wheel to determine at that time whether they were qualified or not, and that the court could only excuse or discharge any person drawn and summoned as a petit juror whenever in its discretion such action shall be deemed expedient. The statute involved is 28 [38] O.S.A. 21, 1961. This law was first passed in 1949 and was amended in 1961. It was again amended in 1963. The difference between the 1961 amendment and the 1963 amendment is that the following is removed from the 1961 amendment, to-wit:

'At such drawing no person other than those named shall be permitted to be present.'

This was left out entirely in the 1963 amendment indicating that the names should not only be drawn in open court but that any person interested, especially a defendant and his counsel, would have the right to be present to observe the operations of the committee or officers in withdrawing the names from the jury wheel so that they could observe for themselves whether or not the statute was being complied with. The statute does not authorize the exercise of any discretion whatsoever on the part of the presiding District Judge, the Court Clerk, or the Sheriff. The only time that discretion can be exercised is after the jurors names have been drawn and summoned. This is clearly the provisions of

the statute, and we quote from a portion of the 1963 amendment:

'The court may excuse or discharge any person drawn and summoned as a grand or petit juror whenever in its discretion such action may be deemed expedient.'

Clearly it was the intention of the Legislature to completely exclude any discretionary powers on the part of the Court prior to the time that the name of the juror is drawn and summoned. To allow a District Judge in drawing the names of jurors to remove them from the panel for any reason which the Court thinks is expedient or justified would be an endless power of discretion on the part of the Court to hand-pick a jury. We think this is such a clear violation of the Defendant's right that entitles him to a new trial."

█ Defendant cites no authority in support of this contention and we believe the language used in 50 C.J.S. Juries § 164, p. 891 is compelling in the instant case and the language used in Harmon v. Territory, 9 Okl. 313, 60 P. 115 is controlling. The pertinent part of 50 C.J.S. § 164, states:

" * * * If in drawing the jury the names of persons who are dead or have removed from the county are drawn, these names should be excluded and others drawn to complete the panel * *."

Harmon v. Territory, supra, is as follows:

"Another objection urged is that the court overruled the defendant's challenge to the panel of jurors. The record discloses that at the time of the drawing of the jury it was discovered by those making the drawing that three names drawn out of the box were the names of parties known to be nonresidents of the territory, and the slips containing these names were destroyed, and others drawn in their stead. Now, while this act on the part of the persons intrusted with the drawing of the jury was unauthorized by law, and in excess of their authority, we are inclined to the belief that such action could in no way have prejudiced the rights of the defendant, as the record develops that the names which were drawn in lieu of those rejected were the names that would have been drawn if the law had been strictly complied with; that is, if the nonresidents whose names were drawn had been delivered to the sheriff, and he had made the return that such parties were nonresidents, it would have necessitated another drawing from the box, and the identical names which were in this case drawn would have been drawn, and such a proceeding would have made no change in the personnel of the jury. The record shows that the requisite number of jurors were drawn in the regular manner and legal way prescribed by the statute. Therefore we think that this action of the officers drawing the jury in no way jeopardized the rights or affected the interests of the defendant."

Finding that the defendant has wholly failed to establish that he was prejudiced in any way by the actions of the trial court, we are of the opinion that this assignment of error is without merit.

█ It is next argued in substance that the evidence is wholly insufficient to support the verdict of the jury. We have heretofore detailed the evidence submitted to the jury for its consideration and are of the opinion that the evidence amply supports the verdict of the jury. From the physical evidence at the scene it is readily apparent that the defendant mortally wounded the unarmed James R. Chaney, while the said Chaney was attempting to flee, and although substantial evidence was offered as to the emotional condition of the defendant prior to the offense and subsequent thereto when he was committed for observation, there was no direct testimony offered by any lay witness or medical witness respecting his capacity to distinguish between right and wrong at the time of the homicide. Even if such evidence had been offered, the reliability of the testimony of an expert or lay witness and the weight and credit to be given such testi-

mony is a matter for the jury's determination. There are facts and circumstances surrounding the homicide from which the jury might reasonably conclude that at the time of the homicide the defendant was capable of distinguishing right from wrong (for example, his attempt to call counsel), and it is not unreasonable to conclude that the defendant's subsequent psychosis was triggered when he recognized the enormity of his crime.

■ Under these circumstances, we follow the rule set forth in Williams v. State, Okl.Cr., 373 P.2d 91, wherein this Court stated:

"Where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts."

■ Defendant's fourth assignment of error is that the punishment imposed is cruel and unusual and that if the court finds sufficient evidence to support the verdict of the jury, the court should consider and modify the judgment and sentence of 99 years imprisonment imposed for the following reasons: (a) the previous good character of the defendant; (b) the educational and family background of the defendant; (c) the fact that a previous jury could not arrive at a verdict; (d) the mental condition of the defendant; (e) that a 99 year sentence might require service of a term longer than life imprisonment; (f) evidence relating to the defendant's theory of self defense; and (g) the reference to evidence relating to the deaths of the two Davis brothers.

In the light of the record before us we are of the opinion that the judgment and sentence imposed, in accordance with the verdict of the jury, was amply supported and justified by the evidence as relates to the specific homicide for which the defendant was tried and convicted. In recognition of charges pending in connection with the other two homicides, we decline to make any comment which could be construed as tending to prejudice either the State or the defendant in matters which are exclusively within the province of the jurors under our system of criminal jurisprudence.

As his last proposition the defendant contends "that the verdict of the jury is based upon bias and prejudice of the jury and gave no reasonable consideration of the evidence or the court's instructions in this cause."

Under this proposition he argues that (a) he was prejudiced by references throughout the trial to the other two homicides; (b) by the introduction of photographic evidence by the admission and rejection of offered State photographs which related to the other two homicides; (c) by the admission of the testimony of the widows of the deceased which had nothing of probative value to what actually transpired at the scene of the homicide; (d) by the improper cross-examination of Mr. Smithen, counsel for defense, with reference to his employment relating to fees received therefor; and (e) by the District Attorney's statements in closing argument concerning his defense attorney's interest in the case and his presence at the crime scene a short time after the homicides, alone, near the bodies of the two deceased Davis brothers, where the knives were later found.

■ Without unnecessarily lengthening this opinion, we are of the opinion that contention (a) in this assignment, is without merit for the admission of the evidence of the other homicides falls squarely within the rule enunciated in Syllabus Three of Swarb v. State, Okl.Cr., 358 P.2d 850, wherein we stated:

"Where shootings other than the one with which defendant is charged occur at the same time and place, without definite interruption, and are a continuous

transaction, such shootings are part of the res gestae, and are admissible in evidence."

■ Contention (b) under this proposition, is likewise without merit for it falls within the rule stated in Syllabus No. 8 of Pate v. State, Okl.Cr., 361 P.2d 1086, as follows:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places."

■ Contention (c) is likewise without merit for this testimony was clearly offered to show the activities of the three men on the morning prior to their death; their appearance and frame of mind shortly before they arrived at the Walters' residence; and whether or not they were armed or unarmed at the time they left their respective homes, all of which was circumstantial evidence properly admitted for the consideration of the jury.

■ Defendant's contention (d) falls within the rule enunciated in Wallace v. Kopenbrink, 31 Okl. 26, 119 P. 579, wherein the Honorable Judge Hayes had this to say:

"Where an attorney testifies as a witness for his client in a case, communications between him and his client relative to the fee he received in the case is not privileged. * * * This rule is wise and just. To surround an attorney who takes the witness stand in behalf of the client he represents with a cloak of protection against cross-examination that will show his interest and possible bias in a cause would result in subjecting the adversary in the case to the dangerous effect of testimony clothed with the appearance of being unbiased and unprejudiced, when as a matter of fact it might be extremely to the contrary; and no good whatever could follow from such a rule. When an attorney goes upon the stand as a witness, he is not and should not be exempt from any of the rules applicable to other witnesses for testing his interest in the suit in order that the jury may competently judge whether he is biased and determine intelligently what weight and credibility is to be given to his evidence. * * *"

■ In connection with defendant's contention (e), we observe that no objection was interposed, nor exception taken to the ruling of the court, nor was a request made for a mistrial, and thus there is nothing preserved in the record for consideration of this Court. In Robison v. State, Okl.Cr., 430 P.2d 814, we stated:

" * * * [I]f counsel wishes to preserve in the record alleged errors committed during the closing argument of the State, * * * when objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done the matter cannot be presented for the first time in the Motion for New Trial and in the Petition-in-Error and briefs on appeal. In the event counsel for the defendant considers the remarks so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error, counsel for defendant should move for a mistrial and preserve this in his Motion for a New Trial."

In conclusion we observe that this case presents a most unusual example of the diligent and skillful representation of defense counsel. Mr. Smithen is to be commended for the conscientious and efficient manner in which he represented the defendant, his arrival at the scene of the crime, preservation of detailed notes and the manner in which he and co-counsel represented the defendant throughout the pretrial and trial proceedings and the numerous appearances made in the trial and in

this Court, reflect credit upon the legal profession. The defendant's case was thoroughly prepared and his theories of defense well presented. The trial also presented a difficult task for the prosecutors and the trial judge, who presided with fairness and impartiality, and they discharged their duty with fidelity.

In the light of the record before us and for all the reasons above set forth, we are of the opinion that the judgment and sentence appealed from should be, and the same is hereby

Affirmed.

BRETT, P. J., and NIX, J., concur.