Truman Reaul **TROWBRIDGE**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. A–17246.

Court of Criminal Appeals of Oklahoma.

Oct. 11, 1972.

James C. Langley, Public Defender, Tulsa County, and Pat Malloy, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., Charles F. Alden III, Legal Intern, for appellee.

## OPINION

BUSSEY, Presiding Judge.

Appellant, Truman Reaul Trowbridge, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Tulsa County, Oklahoma, for the offense of Murder; his punishment was fixed at life imprisonment and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Jerry McMillen testified that he was a police officer and assigned to the Narcotics Division of the Tulsa Police Department. On the morning of April 2, 1971, he obtained a search warrant for the defendant's residence located at 4815 South 27th West Avenue, in Tulsa. He, three other police narcotics officers, two members of the District Attorney's staff, two agents of the A T & F unit of the United States Treasury Department and a probation officer, proceeded to a location near the de-fendant's house in three unmarked vehicles. By prearrangement, he and Officer McCullough, who were dressed in civilian clothing, dismounted from their vehicle and walked toward the defendant's house. He testified that he and Officer McCullough had beards and that their hair was somewhat longer than usual. As they proceeded across the yard to the porch of the residence, they observed that the inner wooden door of the residence, which had previously been open, was now partially closed. Officer McMillen knocked on the outer door and stated, " 'I'm a police officer, we have a search warrant.' " (Tr. 46) He testified that he had the search warrant in his left hand and that Officer McCullough was standing in front of the door, to his left, displaying his badge and credentials. He heard the scuffling of feet inside the house and then Officer McCullough opened the storm door. He pushed open the inner door with his left foot and both officers entered the house together with their guns drawn. He observed a male subject sitting in a chair directly to his left, a white female sitting on the divan and the defendant, who was moving in the center of the room toward the southeast corner. The defendant raised his right hand to hip high holding a small caliber pistol. He testified that they again identified themselves as police officers and the defendant raised the gun to shoulder level and fired a shot. Defendant ran into the kitchen and both officers pursued him. The defendant was next observed at the back door of the house and he again turned, as he was going through the door, and fired "one or two more times." (Tr. 51) At this point, both officers returned the fire. Defendant went out the back door, across the porch and disappeared behind the utility shed. As the officers ran down the steps, the defendant fired two more shots at them. He (McMillen) returned two shots as the defendant disappeared around the corner of the house. He heard several shots come from the south side of the house and heard Officer McCullough yell from inside the house. He went back into the house and observed that McCullough had the defend-

ant's wife in custody. He heard "quite a bit of commotion outside" and went back out the back door to the south side of the residence. He observed Officer Jones and Agent Larry Elkin scuffling with the defendant in the doorway of the garage. Someone yelled that Sergeant Spybuck had been hit and he proceeded to the front of the residence. Officer Spybuck was lying in front of the residence on his left side with his knees brought up under his chest. He went to his police unit and radioed for an ambulance. He, Agent Buford and Officer Jones returned inside the house to attempt to find the third subject. Upon searching the house, he found the third subject, Birdwell, lying on the floor behind the bed. He ordered Birdwell to keep his hands in sight and to get up slowly. As Birdwell started to get up, he made a motion with his left hand toward his side wherein Officer Jones fired one shot into the wall. After removing Birdwell from the bedroom, he went back out to Sergeant Spybuck and subsequently accompanied him in the ambulance.

Jess McCullough testified that he was an officer with the Tulsa Police Department assigned to the Narcotics Division. He testified that on the morning in question he and the other officers proceeded to the defendant's residence with a search warrant. He and Officer McMillen parked their vehicle in front of a schoolhouse and walked to the defendant's house. As they approached the house, he observed that the inner door of the house was suddenly partially closed. Officer McMillen, who had his revolver in his right hand and the search warrant in his left hand, knocked on the door stating, " 'Police Officers, we have a search warrant.' " (Tr. 112) He (Mc-Cullough) held his weapon in his right hand pointing toward the ground and held his badge case and credentials in his left hand. After a short delay after the knock, he heard a shuffling of feet in the living room area. He opened the outer door and Officer McMillen kicked the wooden door open. They both entered the room simultaneously, he still having his weapon down

to his leg and holding his badge case away from his body. He stated, " 'Police Officers.' " (Tr. 116) Defendant, who was standing near the kitchen exit, had a gun about hip high pointing directly at him. He heard a click and observed the defendant handling the weapon as though he were attempting to eject a spent cartridge. The defendant then fired a shot and ran into the kitchen area. He and Officer McMillen pursued him and the defendant fired two more shots at them. He and McMillen both returned the fire and the defendant ran outside. They followed him outside and the defendant fired two additional shots. McMillen pushed him back toward the porch. He then placed the defendant's wife under arrest. He took her outside and stationed her behind one of the police units and observed Sergeant Spybuck lying on the ground near the front porch. He subsequently discovered a .25-caliber automatic pistol lying on the ground at the south side of the house.

J. William Buford, a Special Investigator with the Alcohol, Tobacco and Firearms Division of the United States Treasury Department, testified that, pursuant to a prearranged plan, he and Agent Elkin proceeded in their unmarked unit in a northerly direction toward the defendant's residence as Officers McMillen and McCullough made their approach on foot. As they were parking in the driveway of the residence just north of defendant's house, he observed Officer McMillen knock on the door. Detective McCullough had his left hand raised holding his badge case. He observed both officers enter the residence with McCullough still holding his badge in front of him. Shortly thereafter, he heard gunfire inside the house and he and Detective Charley Jones ran to the rear of the house on the north side. He testified that he heard approximately four or five shots. Upon arriving at the rear of the house, he discovered that the back yard was fenced. He leaned over the fence and observed the defendant coming from the back of the house. Detectives McMillen and McCullough came out on the back porch

and Detective McMillen jumped off the porch. He heard a shot fired and Detective McMillen jumped back upon the porch. Mc-Millen returned a shot or two at the defendant and he (Buford) ran back to the front of the house and observed Sergeant Spybuck on one knee in the driveway. Spybuck stated, " 'He hit me.' " and attempted to crawl toward the porch. (Tr. 155) He assisted Spybuck to the edge of the front porch wherein Spybuck stated, " 'The son-of-a-bitch shot me.' " (Tr. 156) He proceeded around to the south side of the house and observed Agent Elkin and Detective Jones struggling with the defendant. He then went inside the house with Detectives McMillen and Jones and aided in apprehending Donald Birdwell.

Charley Jones testified that he was a Tulsa Police Officer assigned to the Narcotics Squad. He testified that on the morning in question, he and the other officers went to a residence at 4815 South 27th West Avenue in Tulsa to execute a search warrant. He testified that they went in three separate vehicles and that he was driving a car containing Sergeant Thurman Spybuck, Jim Heslet and Brad Williams of the Tulsa County District Attorney's office, and Jim Stewart, a Pardon and Parole Officer. As Officers McMillen and McCullough walked up to the front porch of the residence, he was pulling his unmarked police vehicle into the driveway on the south side of defendant's residence. He observed McCullough open the outer door holding his black commission case in front of him. He got out of his vehicle and was standing in front of his car as the two officers entered the house. He and Agent Buford ran to the north side of the house and he heard several shots from within the house. He testified that when he reached the fence at the rear of the house he observed the defendant jump off the back steps and run to the southeast corner of the house. Officer McMillen ran down the back steps and the defendant fired a shot in his direction. McMillen fired a shot in the direction of the defendant and he (Jones) ran around to the front of the house. He

observed Sergeant Spybuck attempting to crawl from the side of the house to the front porch area. Spybuck stated, " 'Charley, he shot me.' " (Tr. 183) He heard Agent Elkin yelling in the driveway and proceeded around the side of the house and observed the defendant throw a small black weapon to the ground. Agent Elkin attempted to take hold of the defendant and the defendant jerked away from him. He grabbed the defendant, who was still struggling with Elkin. He hit the defendant once or twice with his right gun hand. The struggle continued down the front portion of the garage wherein they were able to subdue the defendant and handcuff him. He returned to where Sergeant Spybuck was lying and observed that he appeared to be in a far more serious condition. He observed blood on the right hand side of his coat and appeared to be foaming around his mouth. He, Officer McMillen and Agent Buford went inside the residence and found Don Birdwell lying under the bed. Mc-Millen told Birdwell to get up and keep his hands in sight. As Birdwell stood up, he dropped his left hand to his side wherein Jones fired a shot into the wall and stated, " 'Get your hands up.' " (Tr. 190)

Larry Elkin testified that he was a Special Investigator with the Alcohol, Tobacco and Firearms Division of the United States Treasury Department. On the morning in question, he and Agent Buford assisted the Tulsa Police Department in executing a search warrant for the defendant's residence. He testified that as the Officers McMillen and McCullough were approaching the defendant's front porch he drove past the house and parked in the next driveway. He testified that before his vehicle came to a complete stop he heard gunfire. He jumped out of the car and ran south across the front yard. As he was running across the yard, he observed Sergeant Spybuck directly in front of an automobile that was parked in defendant's driveway. He observed Sergeant Spybuck slip in the gravel and fall to one knee. Shortly thereafter, he heard gunfire and Spybuck appeared to flinch and dropped his

service revolver. Spybuck quickly picked the weapon up and began to crawl in a northerly direction. Elkin testified that he observed Spybuck fire three shots while he was on his hands and knees. He jumped over Spybuck and ran to where he could see down the driveway. He observed the defendant standing approximately 125 feet away pointing a gun in his (Elkin's) direction. The defendant threw the gun to the ground, threw his hands in the air and yelled that his gun was empty. Elkin ordered the defendant to get up against the side of the house. As he walked up to the defendant, the defendant attempted to turn away from the side of the house wherein he grabbed his arm and struck him in the head with his pistol. He testified that Officer Jones arrived at the location and the struggle continued down the side of the driveway into the front of the garage. He testified that they were finally able to place him on the floor of the garage and put the handcuffs on him. He went back to the front of the house to check on Sergeant Spybuck. He asked Spybuck if he was hurt and Spybuck replied, " 'The son-of-a-bitch shot me.' " (Tr. 213)

James Stewart testified that he was employed as a State Probation and Parole Officer. He testified that on the morning in question he accompanied the other officers to the defendant's residence. The car in which he was riding was parked just north of the front door of the defendant's residence. He proceeded to the south side of the house behind a car that was parked in the driveway. He observed the defendant come around the corner at the back of the house with a weapon in his hand. The defendant pointed the weapon and fired in the direction of the position occupied by Sergeant Spybuck. The defendant then placed his left hand on top of the weapon as if to eject a shell. Stewart raised up and started taking aim at the defendant and the defendant dropped his weapon stating, " 'Don't shoot, don't shoot!' " (Tr. 228) Officer Elkin ran past him and ran toward the defendant. He observed Ser-

geant Spybuck in front of the house half slumped over holding his side.

Brad Williams, Assistant District Attorney for Tulsa County, testified that he prepared the search warrant and accompanied the officers to execute it at the defendant's house. He testified that during the course of the event he positioned himself behind the vehicle which was driven by Officer Jones. He heard approximately five gunshots from inside the house and five or six fired outside the house. He observed Sergeant Spybuck staggering backwards with his hand inside of his windbreaker just over his heart.

Jim Heslet testified that he accompanied the officers to the defendant's residence. He testified that he also positioned himself behind Officer Jones' vehicle. He heard three series of gunshots at the conclusion of which, he observed Sergeant Spybuck seated on the ground with his hand on his chest area.

Tom Lewallen testified that he was a Tulsa Police Officer assigned to the Records and Identification Bureau. At approximately 11:30 a. m. on the day in question, he responded to a call directing him to the defendant's residence. He identified certain photographs which he took at the crime scene. He recovered a .25-caliber Titant automatic pistol from the south side of the house. He testified that the ammunition clip, which was still inside the weapon, was empty. He further testified that he recovered a live .25-caliber cartridge in the immediate area where the pistol was fired. He found three spent .25-caliber cartridges on the east side of the building and one spent cartridge at the southeast corner of the building. One spent .25-caliber cartridge was found inside the house by another officer. He further testified that he mailed the physical evidence found at the scene, along with a slug obtained from Officer Pilkington, to the Federal Bureau of Investigation Laboratory in Washington, D. C. The package containing the evidence was subsequently mailed back to the Tulsa Police Department from Washing-

ton. He placed the package in the Property Room of the police department and it was not opened until the day he testified when it was opened by Special Agent James D. Beck of the Federal Bureau of Investigation.

Kenneth Aery testified that he was a Tulsa Police Officer assigned to the Records and Identification Division. He, Officer Webb and Officer Lewallen conducted the crime scene search investigation at the defendant's residence. He was assigned to make the investigation of the inside of the residence. He testified that he did not find any evidence of weapon marks in the living room. He found a box of .25-caliber ammunition in the kitchen with eight shells missing. A spent .25-caliber cartridge was found near the range in the kitchen. Two bullet holes going in an outward direction were found the back screen door.

The parties stipulated that the testimony of Dr. Donald E. Southern, who testified at the preliminary hearing, could be read into evidence. Dr. Southern testified that he was a resident in surgery at Hillcrest Hospital in Tulsa. He attended to Thurman Spybuck after he was brought to the hospital and subsequently recovered a small caliber slug from his body. He turned the slug to an officer who he thought was a Lt. Thompson. He testified that there were several officers present at the time. The cause of death, in his opinion, was a gunshot wound that penetrated the heart and liver.

Detective Pilkington testified that he received a bullet from Dr. Southern at St. Francis Hospital. He placed the bullet in an envelope, marked the same with his initials and delivered it to the property room at the police department.

James Beck testified that he was formerly employed as a Firearms Identification Officer with the F.B.I. Laboratory in Washington, D. C. After being qualified as an expert witness, he identified the package which he received from Officer Lewallen of the Tulsa Police Department. He testified that he conducted an examination of the contents therein and was of the opinion that the one misfired cartridge, the five spent cartridges and the slug were all fired from the .25-caliber automatic pistol. He testified that the weapon was capable of holding eight rounds, seven being loaded in the magazine and one in the breech of the weapon. He test-fired the gun and discovered that the ejected shells flew upward and rearward as the gun was fired.

Dr. Robert Fogel testified that he was a consultant pathologist with the County Medical Examiner's Office. He performed an autopsy on the body of Thurman Spybuck. He determined that a bullet penetrated Spybuck's right chest between the seventh and eighth ribs in an upward trajectory penetrating the diaphragm, liver, lung and heart. He testified that, in his opinion, the cause of death was an explosive laceration of the heart.

For the defense, the defendant introduced a newsreel film taken by news photographer David Smeal at the scene. The film reflected the personal appearance of Officers McMillen and McCullough.

Dr. Gerald Gustafson testified that he treated the defendant on April 2, 1971 at St. Francis Hospital. The defendant had been shot in the right thumb and abdomen and had superficial facial cuts and abrasions.

Glenda Trowbridge, the defendant's wife, testified that on the morning in question "some bearded guys came in our house." (Tr. 393) She testified that she did not hear them knock nor did they identify themselves as police officers. At least one of them, according to the witness, had a weapon in his hand as they entered the house. The defendant yelled for her to call the police and he ran into the kitchen. The two bearded persons followed him into the kitchen and she started to the telephone to call the police. One of the men saw her and hollered, " 'Stop, or I will shoot you.' " (Tr. 397) She testified that the defendant did not point a gun at the two persons in the living room. One of the persons shot toward the back door, breaking the window.

The next time she saw her husband, they had him on a stretcher taking him to the ambulance.

The defendant testified generally concerning his early life and the various jobs which he had held in the past. He testified that he pleaded guilty to second degree burglary when he was eighteen in Blaine County and received a two-year sentence. He also entered a plea of guilty at approximately the same time in Kansas to the offense of forgery and received a suspended sentence. On the morning in question, he, his wife and Donald Birdwell were sitting in their living room. He observed two bearded individuals walking across his yard and got up and closed the front door. He returned to the couch and sat down. He heard a knock and started to get up to open the door when the door was suddenly kicked open. The two persons entered the room and pointed a gun at him, whereupon he jumped up and ran into the kitchen. He grabbed a gun which was lying on the icebox and ran out the back door. As he ran out the back door, one of them started shooting at him. He denied pointing his gun at the two individuals while they were in the house. He ran around the corner of the house and the persons continued firing at him. He returned the shots. He testified that he was not sure, but thought he was struck by a bullet prior to rounding the corner. After he got around the corner, he continued to hear gunshots and did not know where they were coming from. He testified that he did not know whether or not he fired his weapon after he turned the corner. Someone ran up to him and told him to get up against the wall. He could not remember everything that happened thereafter but he did remember someone hitting him on the head with something. He stated that he had previously testified before a Tulsa County grand jury and was apprehensive about his personal safety after reading what had happened to other jury witnesses. He testified that he did not know the two persons that entered his house were police officers and was of the opinion that they were going to kill him.

On cross-examination, he testified that he traded a watch for the .25-caliber pistol the previous day in Konawa. He testified that he bought some ammunition for the weapon and loaded it when he arrived home. He did not remember whether he put six or eight shells in it. He testified that he did not have any reason to fear the men that came in the house except for his concern about testifying before the grand jury.

The prosecuting attorney thereupon questioned the defendant concerning amphetamines, barbiturates, LSD, hypodermic needles and marijuana that were found in defendant's car and house. The defendant denied knowledge of any of the drugs.

In rebuttal, the State called Jerry White who testified that he was presently confined in the Tulsa County Jail. He related a conversation that he and the defendant had while they were in the dress-out room of the jail. The defendant stated, "'I killed the dirty son-of-a-bitch and I'm going to get away with it.'" (Tr. 615)

The State recalled Officers Aery, Elkin, Lewallen and Jones who testified concerning the items of evidence that each recovered at the defendant's residence and in his car.

William Caveny testified that he was a forensic chemist employed by the Oklahoma State Bureau of Investigation. He conducted a chemical analysis on the drug items which were recovered by the officers from the automobile and home of the defendant. It was his opinion that the items which were sent to him contained barbiturates, amphetamines, LSD, codeine and marijuana.

In surrebuttal, Paul Grubb testified that he was presently incarcerated in the Tulsa County Jail. He testified that he had a conversation with Jerry Eldon White approximately two weeks before the trial and White stated, "'I would do anything or say anything to get out of this.'" (Tr. 689)

Larry Bagby and Louie German testified that they were cellmates with Jerry Eldon White. They testified that they were concerned about an informer in their cell and

made up the stories that they heard the defendant state that he had killed the officer and was going to get away with it. They told the story to White in an attempt to find out if he was the informer.

The defendant was recalled and denied making the statement to White.

Donald Birdwell was called by the defense and testified that he was present in the defendant's residence on the morning in question. The defendant stated that there were two men coming across his yard and got up and shut the door. He further testified that he heard a knock on the door and suddenly the door was kicked open and the two men jumped in and pointed guns at them. The two men did not identify themselves as police officers. The defendant backed off into the kitchen and ran out. He testified that he did not see a pistol in the defendant's hand. He did not see any shots fired.

■ The first proposition asserts that the trial court erred in denying defendant's request for investigative funds. The defendant candidly admits that there is no Oklahoma statute which would permit the authorization of court funds for investigative help for indigent defendants; however, he argues that the denial of such funds deprived him of his constitutional right to adequate representation. We cannot agree with this contention. In the case of United States ex rel. Smith v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549, the defendant contended that the failure of the trial court to appoint various psychiatrists to aid in his defense constituted a denial of his right to a fair trial. The Court stated:

" * * * Petitioner further asserts that he should have been given technical pretrial assistance by the State. Although the trial judge testified that defense counsel made no such request, petitioner here states that the trial court refused to appoint a psychiatrist to make a pretrial examination. *We cannot say that the State has that duty by constitutional mandate.* See McGarty v. O'Brien, 1 Cir.,

188 F.2d 151, 155. * * *" (Emphasis Added)

We, therefore, find this proposition to be without merit.

■ The second proposition contends that the trial court erred in excluding the juror, C. E. Morris, for cause for opposition to the death penalty. We do not deem it necessary to set forth the voir dire examination of the prospective juror. The question of the exclusion of the juror for cause based upon his scruples against the death penalty was rendered moot by the fact that the defendant received a sentence of life imprisonment. In Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L. Ed.2d 797, Mr. Justice Stewart, speaking for the Court, stated:

"In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. *Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment.* The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations omitted.] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone,' * * *" (Emphasis added)

In the instant case, there is no evidence in the record which would reflect that the jury was "prosecution prone." We, therefore, find this proposition to be without merit.

The third proposition asserts that the court erred in allowing Officer Charley Jones to be excluded from the rule of sequestration and remain in the courtroom to assist the prosecution and not require him to testify first. In dealing with a similar proposition in Baker v. State, Okl.Cr., 306 P.2d 344, the Court stated:

"This contention has been resolved against the defendant in Harrell v. State, 36 Okl.Cr. 225, 253 P. 516, wherein the rule was stated as follows:

'The exclusion of witnesses for the state, at defendant's request, is not an absolute right in all cases, but rests in the sound discretion of the trial court, and this includes the power to except one or more witnesses from the operation of the rule.

'It is proper practice to permit the prosecuting witness, or some officer active in the prosecution of the case, to remain in the courtroom to advise the prosecuting attorney as to the facts, interest, and character of witnesses, etc., though the state's witnesses generally are excluded.' "

We are of the opinion that the trial court did not abuse its discretion in allowing Officer Jones to be excluded from the rule. Jones' testimony was corroborated not only by the officers that testified before him but by those whose testimony came after Officer Jones testified.

The fourth proposition contends that the court erred in denying defendant's motion to inspect a "state investigation report." The record reflects that during the course of the trial, the following transpired:

"MR. MALLOY: Your Honor, at this time I would like to ascertain from the District Attorney whether or not this witness has made a written report of any investigation he made concerned with the identification or inspection of the premises, and if so I would like to have a copy of his written report at this time.

"MR. FALLIS: Well, your Honor, of course all police officers, whether they are in the identification division, or parole division, or detective division, as a normal portion of their work make reports. This officer is available here to testify, we would resist any efforts to get the work product of the file of the Tulsa Police Department. We are not relying upon any technical expert testimony from this witness, and his testimony will be concerning the inspection of the premises.

"THE COURT: Do you have any authority for your request?

"MR. MALLOY: I think at any time that it becomes evident that a person is going to testify from a report he made, particularly that one of—

"THE COURT: If he is testifying from the report there is no question about it.

"MR. MALLOY: Or if he made one, for the purpose of possible impeachment I am entitled under the law to have it.

"MR. SHAFFER: What authority?

"MR. MALLOY: And to ascertain from it in advance before he testifies.

"THE COURT: I would have to be furnished some authority on that, I don't know of cases on the law on that, I know in Federal Courts in some instances they do.

"MR. MALLOY: There is plenty of federal authority for it.

"MR. LANGLEY: I believe the defendant is entitled to any evidence the State has which might tend to prove the defendant's innocence, or go to mitigation.

"MR. SHAFFER: I guarantee we have none of that sort.

"MR. LANGLEY: It should be for the defendant to determine.

"THE COURT: The motion is overruled." (Tr. 251–253)

We are of the opinion that the trial court properly denied defendant's motion to inspect the investigation report and that the same was a "non-technical work product" of the Tulsa Police Department. The recent case of State ex rel. Fallis v. Trues-

dell, Okl.Cr., 493 P.2d 1134, stated in the second and third syllabi:

"An accused is not entitled to discovery and inspection of unsworn statements of a prosecution witness in the possession of the State, of the transcript of the statement of a prosecution witness taken by a prosecutor or peace officer during an investigation or preparatory to trial, or of the 'work product' of the State consisting of unsworn statements signed by others than the accused.

"The State's 'work product' shall include reports compiled by a law enforcement agency in the course of its investigation into a criminal offense and statements obtained by prosecuting attorneys and peace officers from various witnesses for the State, without regard to whether such statements or reports are later sought for the purpose of cross-examination or impeachment."

We, therefore, find this proposition to be without merit.

The fifth proposition contends that the trial court erred in overruling defendant's demurrer to the State's evidence. Defendant argues that the essential element of premeditation is wholly missing from the State's evidence and absent such, a murder conviction cannot lie. Defendant's trial attorney, Mr. Pat Malloy, filed an Amicus Curiae Brief wherein he asserts:

" * * * [T]here was no evidence of heat of passion—only fear on the part of Trowbridge—and absence [sic] heat of passion, and no premeditation, this Court should not simply reduce the conviction from murder to manslaughter but should order an outright reversal of Trowbridge's conviction."

We are of the opinion that the question of defendant's intent was a proper question to be submitted to the jury. The evidence on behalf of the State established that the officers knocked on the door, announced that they were police officers and had a search warrant prior to entering the house. They again identified themselves as officers upon entering defendant's residence.

The evidence on behalf of the defendant adduced that the two subjects did not identify themselves as officers nor did they state their purpose for being there and that he was in fear of his life because of testimony given to the Tulsa grand jury and that he fired only after he had been shot at. In Johnson v. State, Okl.Cr., 386 P.2d 336, wherein the defendant was convicted of murder for the killing of a police officer in Tulsa County after he had been placed under arrest for burglary, we stated:

"In the instant case, the defendant was proceeding on a mission of crime and being thwarted by the approach of the law, broke and entered the dwelling of the Hillenbergs'. His unlawful resistence and announced intention to destroy Officers Greer and Burch accompanied by the present power of execution was instinctively repelled with retaliation by Officer Burch, and whether in the confused seconds that followed, his murderous assault, or the spontaneous retaliatory shots fired by Burch, produced the death of Greer, the author's (accused) purpose was accomplished.

"We believe the authorities cited by the Attorney General are particularly applicable here. In People v. Podolski, 332 Mich. 508, 52 N.W.2d 201, it was held that:

'When a defendant deliberately engenders an affray, deliberately using therein a lethal weapon, it must be considered to be within his intent that death should result from the affray as a natural and probable consequence of his acts, where the death is directly attributable to the affray and not resulting from some independent intervening cause.' See, also, Commonwealth v. Redline, 391 Pa. 486, 137 A. 2d 472, 1958.

"We therefore hold that where, as in the instant case, an accused commits an assault designed to produce injury or death upon officers of the law, and injury or death does result without any intervening cause, but from an instinctive retalia-

tory force, the accused is criminally responsible. * * *"

We therefore find this proposition to be without merit.

■ The sixth proposition asserts that the court erred in denying defendant's request to examine an unsworn prior inconsistent statement made by the defense witness, Glenda Trowbridge. In State ex rel. Fallis v. Truesdell, supra, we held that a defendant is not entitled to the discovery and inspection of unsworn statements of prosecution witnesses in possession of the State. We, therefore, find this proposition to be likewise without merit.

■ The seventh proposition, asserted by both the defendant and the Amicus Curiae Brief, alleged that the trial court erred in allowing the State to introduce evidence of separate and unrelated offenses. We observe that the evidence of the other offenses was not introduced in the State's case in chief but rather, after the defendant had testified that he was acting in self-defense. The defendant testified on cross-examination as follows:

"Q. And are the only worries you had that day is because you had testified before that grand jury?

"A. I don't know what you mean, only worries I had.

"Q. Well, did you have any reason to fear that men might come in your house for any other reason?

"A. No.

"Q. None at all?

"A. No." (Tr. 525)

Thereafter, the trial court, in denying defendant's motion for mistrial on the basis that evidence of independent crimes were introduced, stated:

"THE COURT: There is an issue in this case, the principle involved in this case, as I see it, is the state of mind of the defendant at the time all of these incidents occurred; anything which relates to his state of mind is admissible, even though it may show other crimes. * * *" (Tr. 532)

We are of the opinion that the trial court's ruling was proper in that the evidence of other offenses was admissible and that they tended to prove the defendant's motive and intent. In Moulton v. State, Okl.Cr., 476 P.2d 366, we stated:

" * * * However, evidence of separate and similar offenses is admissible when it is material and proper to show (1) motive, (2) intent, (3) absence of mistake or accident, (4) identity of person charged with the commission of the crime for which an accused is put on trial, and (5) common scheme or plan embracing the two or more crimes so related to each other that proof of one tends to establish the other. * * *"

■ The eighth proposition contends that the trial court erred in allowing detailed inquiry of defendant on cross-examination of the prior felony convictions. Defendant argues that it was improper to allow the prosecuting attorney to inquire whether the co-defendant in the defendant's previous burglary conviction was armed. We need only observe that on direct examination the defendant testified concerning his former convictions as follows:

"Q. Are those the only two convictions, felony convictions, that you have been convicted of, the forgery and the second degree burglary?

"A. Yes, sir.

"Q. Do you know what second degree burglary is?

"A. Yes, sir.

"Q. Will you tell the Court and Jury what it is?

"A. Tell what it is or what I did or—

"Q. Just what is it, what is the crime itself?

"A. Breaking into a building or a house, an occupied building or house, with intent to steal something.

"Q. It doesn't have anything to do with a gun?

"A. No, sir." (Tr. 459)

In Lung v. State, Okl.Cr., 420 P.2d 158, we stated:

> "This Court stated in Williams v. State, Okl.Cr., 373 P.2d 85:
>
> > 'The rule is well settled that, ordinarily, a party may not complain of an error which he himself has invited, or which he has waived, either expressly or impliedly. *This rule clearly applies to a case where one party resorts to incompetent evidence without objections, and where the opposite party relies with evidence of the same character. In such case, both are at fault and neither can complain in this court of the admission or exclusion of the evidence by the court below.*' " (Emphasis added)

■ The ninth proposition asserts that the trial court erred in overruling defendant's motion to suppress evidence obtained by a warrantless search of defendant's Buick automobile. We are of the opinion that the evidence found in the defendant's automobile was admissible for the purpose of impeachment. The defendant, on cross-examination, denied any knowledge of the drugs found in the vehicle. In Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the defendant was convicted of purchasing and possessing heroin. Certain evidence which was the product of an unlawful search was introduced therein for the purpose of impeaching the defendant. In affirming the conviction, the United States Supreme Court stated:

> "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment.
>
> " * * * [T]here is hardly justification for letting the defendant affirma-

tively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."

The *Walder* holding was reaffirmed by the United States Supreme Court in the case of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The Court applied the rule set forth in *Walder,* supra, to a case wherein the petitioner claims that a statement made by him to police under circumstances rendering it inadmissible in the prosecution's case in chief under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) could not be used to impeach his credibility. In affirming the conviction, the Court, through Justice Burger, stated:

> "It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in Walder. Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.
>
> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the

stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. * * *"

■ The tenth proposition contends that the court erred in "overruling defendant's objection to given instructions and refusal to give defendant's requested instructions." We have carefully examined the court's instructions and the defendant's requested instructions and conclude that the court's instructions, when considered as a whole, fully and correctly state the applicable law of the case. The court instructed the jury as to the applicable law with regard to the offense of murder, manslaughter and shooting with the intent to kill. The court further instructed the jury as to justifiable homicide and self defense. In Jones v. United States, 251 F.2d 288 (10th Cir. 1958), cert. den. 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715, the Court stated:

"* * * The duty of the trial court is to instruct on the general principles of the law of the case. It is not required to include in its instructions what is not the law of the case nor to give instructions 'in the language offered by the litigants * * *' Butler v. United States, 10 Cir., supra, 197 F.2d [561] at page 564. See also Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021."

■ The eleventh proposition contends that the prosecuting attorney made improper remarks during the closing argument. We have carefully examined each of the alleged improper remarks made by the prosecuting attorney and observe that there was no objection made to the particular arguments now assigned as error by defendant. In Overstreet v. State, Okl.Cr., 483 P.2d 738, we stated:

"The record does not reflect that any objections were interposed to the argument, nor were exceptions taken to the court's ruling, nor was there a request made for a mistrial and thus there is nothing preserved for consideration by this Court. We have previously held that if counsel wishes to preserve the record during closing argument of the State, that when an objectional statement is made by the prosecuting attorney, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done, the matter cannot be presented for the first time in the Motion for New Trial and in the Petition in Error and briefs on appeal. In the event counsel for the defendant considers the remarks so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error, counsel for defendant should move for a mistrial and preserve this in the Motion for New Trial. Walters v. State, Okl.Cr., 455 P. 2d 702. See also Robison v. State, Okl. Cr., 430 P.2d 814."

■ The twelfth proposition contends that the court erred in overruling defendant's motion for a new trial based on newly discovered evidence. At the motion for new trial, the defendant presented the testimony of James Porter and Willard Thompson, both of whom were employed by the Department of Corrections. They testified that they had a conversation with Jim Stewart, the afternoon of the shooting, about what had happened at the defendant's residence. They both testified that Stewart did not tell them that he had seen the defendant fire the shot and gave vague answers to their question as to what the defendant looked like. On cross-examination, Mr. Porter testified that he had had a subsequent conversation with Stewart who advised him that he had been advised not to discuss certain things about the case.

Jim Stewart testified that he made a general statement to Porter and Thompson about what he had observed. He testified that he had been previously advised by the

District Attorney's office to not discuss specific details of the case.

It was readily apparent that the only purpose to be served by the testimony of the witnesses, Porter and Thompson, would be to impeach the testimony of Stewart. In Jones v. State, Okl.Cr., 499 P.2d 932, we cited the third and fourth syllabus of Ward v. State, Okl.Cr., 444 P.2d 255, cert. denied, 393 U.S. 1040, 89 S.Ct. 665, 21 L.Ed.2d 588, wherein we stated:

"A motion for new trial upon the ground of newly discovered evidence is not sufficient where it only tends to discredit or impeach the witness for the State and especially where it would not change the result of the trial.

"The granting of a new trial on the ground of newly discovered testimony is a matter largely within the trial court's discretion and is not to be exercised except where there is reasonable probability that, if such evidence had been introduced, different results would have been reached."

We therefore find that the trial court did not abuse its discretion in denying defendant's motion for new trial based on newly discovered evidence.

The final proposition contends that the punishment is excessive appearing to have been given under the influence of passion or prejudice. We have previously held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each particular case and that this Court does not have the power to modify sentence unless we can conscientiously say that under all the facts and circumstances the sentence was so excessive as to shock the conscience of the Court. Roberts v. State, Okl.Cr., 473 P.2d 264. We cannot conscientiously say that a life sentence imposed upon the defendant for killing a police officer in the performance of his duty shocks the conscience of this Court. To the contrary, we are of the opinion that the defendant richly deserved the punishment imposed.

In conclusion, we commend the efforts of defendant's court-appointed attorneys, Mr. Pat Malloy and James C. Langley, in representing the defendant at the trial of the case and for their excellent briefs on appeal.

The judgment and sentence is affirmed.

BRETT, J., concurs.