Don Anderson, Public Defender, for plaintiff in error.

Larry Derryberry, Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

Milton Leon Pietrowski, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County of the offense of Murder; his punishment was fixed at life imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, the following evidence was adduced. Pershing Mills testified that on August 11, 1970, he was employed as a tree trimmer and defendant had been a member of his crew for about three weeks. Mills kept company with defendant's mother. Mills and defendant got off work about 4:30 that day, and went to defendant's mother's house, picking up two quarts of beer on the way. They then went to Mills' mother's house, picking up a half-pint of vodka on the way. They drank there for about 30 minutes and then went to Billy's Bar; after one or two beers, they went to the Lime Creek Bar. This was about 8:00 p. m., and they drank more beer. Leonard

**Melton Leon PIETROWSKI, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–16623.**

Court of Criminal Appeals of Oklahoma.

Sept. 28, 1971.

Hunt (the deceased) was there playing pool. The three also sat at the bar and had conversation. During the evening, defendant said, "Leonard had a lot of money and we ought to roll him," (Tr 9) to which Mills replied, "I don't believe in that kind of business," and left. Defendant and Leonard followed Mills out, and the latter inquired if defendant was ready to go home, to which defendant replied that he was going to stay a while and drive the man home. Defendant got into Hunt's car on the driver's side, and Hunt got in on the passenger's side. Mills then got in his car and left. Mills had been dating defendant's mother three or four years, and had known defendant about two years. He and defendant had had a little trouble in defendant's mother's house: defendant "had his mother pinned up against the wall and was going to choke her." When Mills interceded, defendant knocked him down and stomped him.

Officer Minor, of the Oklahoma City Police Department, testified that he and his partner, Gibbs, were riding patrol the night of August 11, 1970. They noticed a car in the Lime Creek Bar parking area standing with the right front door open. Soon they saw a person standing at the open door. Upon investigating, they determined that he was drunk, and saw what appeared to be a bloodstain on his shirt. They arrested this person for drunkenness, and Minor identified him in Court as defendant. On looking in the car, Minor saw a bloodstain on the seat and a billfold on the floorboard, containing identification of a Leonard Lee Hunt. Minor searched around the area and soon discovered a man lying face-down in the bottom of a nearby creek bed, apparently lifeless. Minor booked defendant in at the jail for murder, and found on defendant's person, among other things, two cigarette lighters, and two Scott Chevrolet receipts.

Dr. John E. Pless testified that he was Assistant State Medical Examiner, and performed an autopsy on the body of Leonard Lee Hunt on August 12, 1970. He found many bruises about the face and nose indicative of blunt force, linear lacerations at the neck which could come from fingernail scratches, and two recent fractures of the larynx. There were also two fractures of the neck bones. In his opinion, the death was caused by asphyxia, due to manual strangulation. He did not think that the bruise of the right temple, although caused by considerable blunt force, could have alone caused the death; he could not separate it as a factor from the other injuries. He testified that because the larynx is so well protected by the shoulders, chin, and back of the neck, larynx fractures caused by anything other than manual force are extremely rare. He conceded that the linear lacerations on the neck could have been caused by falling among sunflowers, and that the larynx fractures could have been caused by falling from an embankment onto a log, although in the latter event, he would expect a single fracture, not two.

Charles B. Sanders testified that he worked in the Parts Department of Scott Chevrolet, and identified two receipts, part of State's Exhibit One, as tickets that he wrote August 11, in a sale to Leonard Lee Hunt.

Officer Burke, of the Oklahoma City Police Department, testified about examining the area of the creek bed behind the Lime Creek Bar on August 12, 1970. In the tall grass he observed a matted-down area and apparent blood stains, and found a wallet, a billfold, and car keys on a ring. One of the keys fit the Chevrolet sedan. The victim's wallet was in the car. Defendant's wallet was in the creek bed. Burke took various pictures of the scene, and identified them in court.

Ladonna Mae Stevens testified that the deceased was her step-father, and that a cigarette lighter, a black billfold, and eye glasses found at the scene were similar to such articles belonging to her step-father (Tr 89).

Officer Gibbs, of the Oklahoma City Police Department, testified that he was Mi-

nor's partner that night. His testimony did not differ substantially from Minor's, except that Gibbs testified that when he first looked, he saw defendant walking from the ravine area.

Defendant testified that he was 22 years old, and lived with his mother, Goldie Hartsell, and on August 11, 1970, was employed in Pershing Mills' crew as a tree trimmer. Until about nine months ago, Mills was planning on marrying his mother. In July of 1970, he and Mills had some trouble; defendant and his mother were arguing, and Mills objected and started walking toward defendant; defendant knocked him down and kicked him. He also testified to other trouble with Mills. On the afternoon of August 11, 1970, he and Mills got off work, and Mills suggested that they get drunk. They went to defendant's house and Mills got two quarts of beer. They went to Billy's Bar, then about 7:30, went to the Lime Creek Bar. Defendant drank some beer, and some peppermint gin, and shot pool. During the evening, Mills remarked to defendant, "If you had the money like Lee Hunt has got, you wouldn't have to worry about working." About 11:15, defendant and Mills went outside and encountered Hunt in his car. Hunt asked defendant if he wanted to go to the Black Angus, and Mills drove off. As defendant approached, Hunt gave defendant the keys and asked him to drive. Defendant got into the car, lit a cigarette, and took a drink from Hunt's bottle. As defendant was trying to fit the key in the switch, some Indian appeared at the car door, and demanded a drink from Hunt. He did not know the Indian, but he resembled Willie Harjo, or Leroy Cash. The car door on Hunt's side opened, and the Indian struck Hunt, and pulled him out of the car. Defendant got out and started around. The Indian met defendant and knocked him down. Defendant started getting sick and saw the Indian "had Lee around the neck like in a half nelson and he was wrestling with him, so when I got up * * * well, this Indian kicked me in

the stomach and threw Lee off that little embankment in front of the car, so he took off and I went down there where Lee was and tried to get him up and got him about half-way up * * * he was too heavy * * * and I let him slide back down, and I was going back in the bar to Wally." A policeman asked him for identification, and defendant could not find his wallet. Looking around on the ground by the car, he saw some papers and picked them up, thinking they were his Army discharge papers.

Defendant was then arrested and taken to the station. He denied taking any money or billfold off Lee Hunt. He denied robbing Hunt or choking him. He had served about two years in the Texas Penitentiary for a murder conviction. Defendant testified that the Texas homicide was accidental, and happened when defendant was shooting at a deer. Defendant denied telling the police that two Indians were there that night.

Paul Hartsell testified that he was defendant's half-brother, and lived at home before going into military service. He had seen Mills at his mother's home numerous times and had had a little trouble with him. He witnessed a fight there between defendant and Mills when Mills started to strike defendant with a chair. He never did see defendant abuse their mother.

Maggie Ann Pietrowski testified that she was defendant's sister and lived at home before her marriage. She worked at the Lime Creek Bar and had trouble with Lee Hunt there; she stated, "He couldn't keep his hands off no woman there." She knew Mills when he was dating her mother. He was drunk a lot, and she stated, "I have never seen him sober." She saw him strike her mother at the Lime Creek Bar, and considered him "crazy jealous" of her. She saw the fight at their house when defendant knocked Mills down. This was in self-defense. The trouble arose when Mills slandered her mother's name. She had never seen defendant abuse their mother. Goldie Ann Hartsell testified that

the fight between Mills and defendant at her house occurred in a drunken argument. Mills threatened her son with a chair, and her son knocked him down. Mills was jealous and wanted to get all of her children out of the home.

In rebuttal, Officer Berglan, of the Oklahoma City Police Department, testified that he interrogated defendant in the Oklahoma City Jail. After being warned of the rights against self-incrimination, defendant denied having any connection with the murder and said that two Indian boys had done it, naming Willie Harjo as looking like one of them. Berglan ascertained that Harjo was in Konowa the night of the murder.

Elverta I. Hunt testified that she was Leonard Lee Hunt's wife, and identified one of the cigarette lighters in State's Exhibit One as belonging to him. She identified writing on one of the papers in Exhibit One as being that of her husband.

█ The first proposition alleges that the verdict is not supported by the evidence. This Court has consistently held that where there is competent evdence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and to determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805 (1970).

█ The last proposition contends that the punishment is excessive. We need only to observe that the punishment imposed is the minimum provided by law.

We have carefully reviewed the entire record and find that it is free of any error which would require reversal or justify modification, and under such circumstances, the judgment and sentence is accordingly affirmed.

BRETT and NIX, JJ., concur.