Raleigh HANEY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17027.

Court of Criminal Appeals of Oklahoma.

Nov. 28, 1972.

Jim Jones, Sallisaw, for appellant.

Larry Derryberry, Atty. Gen., Paul Crowe, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant was charged, tried by a jury, and convicted in the District Court of Sequoyah County, Oklahoma, for the offense of Second Degree Burglary and was sentenced to serve a term of two (2) years in the Oklahoma State Penitentiary, from which judgment and sentence a timely appeal has been perfected to this Court.

On the trial, Mr. O. H. Fine, a farmer and rancher, testified that on November 4, 1970 at approximately 8:00 p. m., after darkness had fallen, he observed a light in the vicinity of his barn across the highway from his home, which area is just north of the Town of Gore. Prior to seeing the light, he testified he heard a vehicle pull off the pavement and into the loose gravel and that, by looking through the venetian blinds at his house, he was able to see a pickup truck pull into the road which approached the gate into his property.

Mr. Fine testified he got his lantern and shotgun, went out the back door of his home and stayed in the shadow of some trees where he could observe the truck and his barn. He stated he saw an individual come back towards the truck, throw a saddle into the truck and, at the time the individual started to enter the truck, he hollered at him. He identified the person with the saddle as the son of the appellant.

Mr. Fine testified that at that time he approached the truck and shined his light into the face of the driver, the appellant, and asked, "Who in the world are you and what are you doing?" He stated the appellant Haney identified himself by name and at that time, the son stated, "We'll pay you. Just let us go. We don't want to be in this, don't want to go to court, shore." Fine stated that he replied, "No, you're going to court." Fine stated he told them to get out that he was going to turn them over to the law and the driver of the truck stated, "You'd better lay that gun down." Fine testified at that point, Raleigh Haney started the truck and backed away while he held the younger Haney at gunpoint. Fine stated that just about the time Mr. Haney started the truck, he instructed the boy at gunpoint to take the saddle out of the truck and lay it down by the gate. He testified that after the saddle was removed, the truck backed out to the road and started in the direction of Webbers Falls but was stoppped at that point by two arriving law enforcement officers. He also identified the saddle and blanket as being the ones that were taken that night and of the value of approximately One Hundred Dollars ($100.00).

On cross-examination, Fine stated he never saw Raleigh Haney outside the truck until after the arrest and stated further that there were two barns, or rather a barn and a hayshed, on the property in the area where the burglary occurred. Cross-examination revealed further that when the boy, Clifford Haney, put the saddle and the pad in the truck that it was put in from the passenger side as opposed to the driver's side of the truck. Fine stated further that it was the son, Clifford, rather than the father who stated that they would pay for the saddle and did not want any trouble. Fine said he talked to the father for several minutes and when he saw he was about to pull out and started the truck, he made the son, Clifford, reach in the truck and get the saddle. Fine stated that Mr. Haney said, "We're going to leave here" and that Fine stated, "The boy isn't going to leave and you're not either." Several pages of cross-examination were devoted to the lock on the barn door, a metal hasp affair which Fine testified was locked earlier in that day.

The only other witness called on behalf of the State was Robert Russell Anderson, Jr. who testified that on the day in question he was the Gore City Marshal and that he went to the Fine residence in response to a call for assistance. Anderson testified that when he arrived Mr. Haney was in his pickup approximately two hundred feet from the barn but that the vehicle was stopped. He identified Haney as a

neighbor that he saw several times weekly. Based on information received from Mr. Fine, Anderson placed Mr. Haney and his two sons, Clifford and Virgil, a younger son who was also in the cab of the pickup, under arrest. Anderson testified the pickup truck was parked partially on and partially off the road at the time he arrived but that Haney was still under the wheel. On cross-examination, Anderson testified that Mr. Haney acted normal and that he did not smell alcohol. He testified further that Haney walked his normal walk, which was not the average man's walk, but that he could not tell or offer an opinion as to whether or not Haney was drunk or had been drinking.

The first witness for the defense was Clifford Lee Haney, the oldest son of Raleigh Haney, who testified that he was sixteen years old and that at the present time he was serving a penitentiary term for the theft of Mr. Fine's saddle. (The admitted Information under which the State proceeded to trial in the case at bar charged Clifford Haney and Raleigh Haney conjointly and acting in concert each with the other in the burglary of Mr. Fine's barn. Clifford, the son, entered a plea of guilty to the Information prior to the time that his father went to trial on the same Information.)

Clifford testified that on the date of the robbery, earlier in the day, he helped his father repair an automobile owned by one Steve Carter. He testified that when the repair job was completed he went home and his father went to a beer joint. He testified he left home and went to the beer joint at approximately 4 or 5:00 in the afternoon and picked up his father's truck, a green GMC pickup, and drove it home. Later in the evening, after dark, he returned to the beer joint with the pickup truck, picked up his father and brought him home. Clifford stated that later in the evening, he decided he wanted to go to Warner to get something to eat and he and his brother, Virgil, and his dad all got in the truck and proceeded toward Warner

with Clifford driving. He stated his father was drunk and that he thought he went to sleep or passed out. Before reaching Warner, he testified that he turned around and came back and at one point felt the urge to urinate and stopped near the gate to Mr. Fine's property. He testified that he got out of the truck, went over to the barn, struck a match, saw the saddle, took it down and was headed for the pickup truck at the time Mr. Fine came out with the shotgun and a flashlight. Clifford stated Fine instructed him to carry the saddle over to the pickup truck and that Fine was trying to get his father out of the truck, but his father was too drunk, falling down drunk. Then Fine had him carry the saddle across the highway to the gate to his house. He stated when the officers arrived, he was standing with Mr. Fine behind him. He testified further that neither his father nor his brother knew anything about his intention to take the saddle.

Clifford testified that when his father started the truck, it was in reverse and went straight back across the highway, off in a ditch, the engine died and it never moved again. He stated at that time his father fell over in the seat. He testified that Mr. Fine hollered at the sheriff when the truck was going across the road.

On cross-examination, Clifford testified he had been driving for approximately two years but did not have a driver's license. He indicated his father was wearing an artificial foot the night in question rather than using his crutches. He testified his father was so drunk when he went to pick him up at the tavern that he had to help him to the vehicle. He also stated that the reason he turned around instead of continuing on to Warner that night was because he thought he was about to run out of gas and didn't know if there was a service station at Warner. He stated that he knew of one all night gas station in Warner but did not want to go there because the police were usually in the vicinity and he knew he did not have a driver's license.

Herman L. Spears, called as a defense witness, testified that on the date in question, he was operating Ford's beer parlor in Gore and saw Raleigh Haney shortly after noon at his tavern. He stated that he checked the place approximately every hour between noon and 6:00 p. m. and saw Haney in his place of business during that period of time. He took over the operation of the bar himself at approximately 6:00 p. m. and Mr. Haney's son appeared at approximately 8:00 p. m. to pick up his father. Spears testified that Haney was drunk at that time and had difficulty in walking. Spears stated he sold the man approximately nine beers between 6 and 8:00 and was not aware of how much beer Haney had bought or consumed prior to 6:00 p. m.

Virgil Wayne Haney, called on behalf of the appellant, testified that he accompanied his father and Clifford on the evening in question and that Clifford was driving the pickup truck. They stopped at the Fine place when his brother indicated he was going to use the rest room. He said his brother left the truck and when he came back he was carrying a saddle. He started to put it in the truck but O. H. Fine came out and stopped him. He indicated his father was "half drunk and half passed out." He also indicated his father started the pickup and backed up after Fine appeared on the scene. He testified, however, that the pickup died on the road as opposed to dying in the ditch. He also testified that when the officer removed his father from the truck, his father just walked over to the officer's vehicle.

Martha Elizabeth Haney, the wife of the appellant, testifying on behalf of the appellant, testified that when Clifford came home on the evening in question, he walked home by himself and that her husband came home some time later, by himself, driving his pickup truck. She also stated that in her opinion, when her husband arrived home, he was intoxicated. She stated that her husband arrived home at approximately 8:00 in the evening,

stayed home for approximately one hour before leaving again with Clifford and Virgil, and that during this period of time he would occasionally drowse off to sleep and then raise up and begin talking again.

The appellant, testifying in his own behalf, stated that on the morning of the day in question he repaired an automobile. At approximately 10:00 in the morning, he went to Mr. Spear's tavern where he remained drinking beer throughout the day. He indicated the man whose car he repaired came into the tavern about noon about his pickup truck and that he saw the owner of the tavern at approximately 3:00 in the afternoon. He testified, however, that he did not recall leaving the tavern that night. He testified he recalled one point in time going home during the evening and then coming back to the tavern. He testified that he doesn't recall anything between the time he returned to the tavern and the time that he became aware that he was in an automobile, under arrest, on his way to Sallisaw. He testified he had no recollection of being in the vicinity of Mr. Fine's barn or had any knowledge that his son stole a saddle from Mr. Fine's barn. On cross-examination, he testified he had no idea how many beers he drank or how much money he spent.

Appellant makes four assignments of error: First, that the trial court committed error in allowing the State to proceed on a second amended Information and thereby denied the appellant due process; second, that the verdict of the jury is contrary to the law and evidence and appears to be given under the influence of passion and prejudice; third, that the trial court permitted counsel for the State to go outside the record in his closing argument and permitted the State the unbridled use of inflammatory statements and arguments not supported by the record; and fourth, that the first three errors, considered either singularly or cumulatively are sufficient to reverse the conviction.

Appellant's initial assignment of error argues that appellant was never arraigned

on the amended or the second amended Information and was also denied his statutory time to plead on the second amended Information and further, he complains that the last amendment was one of substance materially prejudicing the defendant.

■ While there may be some technical merit to the appellant's position, a close reading of the record and the transcript in this case fails to show the appellant was prejudiced by any of the proceedings had herein. With regard to appellant's contention that the second and final amendment was one of substance we note the only difference between the first amended and the second amended Information is a more particular description of the premises which was alleged to have been burglarized. Appellant's argument that he was unable to defend inasmuch as he could not tell the place he was accused of burglarizing can hardly be said to be one of substance inasmuch as he must have had knowledge of the location involved at the preliminary hearing.

■ The difference between the initial Information and the first amended Information was that the first Information charged both Grand Larceny and Burglary, and Grand Larceny was deleted in the second Information. The second Information, as well, charged the two conjointly, that is acting in concert each with the other. The argument that the appellant was never arraigned on the second Information seems to have little validity inasmuch as his demurrer to the Information was sustained. The original record of the hearing on the demurrer reflects that ten minutes before trial, without permission of the court, the appellant filed a demurrer to the amended Information. The court sustained the demurrer to the amended Information and granted an oral motion of the State to file *instanter* the second amended Information. The transcript reflects that the Judge stated that "the second amended Information is filed and the case will proceed to trial on that Information," to which the defend-

ant has entered his plea of not guilty. Appellant objected and moved that the case be remanded back for a new preliminary hearing on the second amended Information but the court overruled the request as without merit and made for the purpose of delay only.

Appellant cites 22 O.S.1971, § 304 as supportive of his position:

> "An information may be amended in matter of substance or form at any time before the defendant pleads, without leave, and may be amended after plea on order of the court where the same can be done without material prejudice to the right of the defendant; no amendment shall cause any delay of the trial, unless for good cause shown by affidavit."

We hold that the amendment made to the Information was without material prejudice to the right of the appellant and further, point out that the last portion of the statute states that no amendment shall cause any delay of the trial unless for good cause shown by an affidavit. No such affidavit appears of record.

■ Appellant argues further that he announced not ready for trial because he had not pled to the second Information and that he stood mute. Counsel cites 22 O.S. 1971, § 491:

> "If, on the arraignment, the defendant require it, he must be allowed until the next day, or such further time may be allowed him as the court may deem reasonable, to answer the indictment or information."

The transcript bears out the fact that the appellant stood mute on the announcement for trial but the record is silent that the appellant complied with the statute, that is to say, he did not require or ask for additional time to plead, and further, we hold that justice will not be defeated simply by permitting the party charged to stand mute when called upon to answer an indictment or information. The statute automatically requires a not guilty plea. Title 22 O.S. 1971, § 523.

We hold therefore that the arguments offered in support of appellant's assisgnment of error No. 1 are without merit and that the appellant was not denied due process.

Appellant's second assignment of error complains that the verdict of the jury is contrary to law on the evidence and that the verdict appears to have been given under the influence of passion or prejudice.

██ Suffice it to say that this Court carefully reviewed the original record and the entire transcript of testimony in light of the allegations advanced in appellant's brief and conclude that this assignment of error is controlled by a long line of authority in this jurisdiction that stands for the proposition that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant is guilty as charged, this Court will not interfere with the verdict even though there is conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and to determine the facts. Pietrowski v. State, Okl.Cr., 489 P.2d 801 (1971).

Appellant devotes a considerable portion of his brief to his third assignment of error in that the trial court permitted counsel for the State of Oklahoma to go outside the recorded in his closing argument and in permitting the State the unbridled use of inflammatory statements and arguments not supported by the record. In support of this contention, appellant has reproduced in his brief twelve separate excerpts from the State's opening and closing arguments which he contends are improper and prejudicial. Further, appellant's counsel has cited a variety of cases that stand for the proposition that the District Attorney must prosecute fairly and without passion or prejudice, that he must not inject improper evidence into the argument and that he must not state his personal opinion as to the defendant's guilt.

We have read most of the cited cases and find they do not apply to the facts. Daney v. State, Okl.Cr., 370 P.2d 44 (1962) involved a situation where the prosecutor waved in front of the jury and commented directly from an FBI rap sheet. Bald Eagle v. State, Okl.Cr., 355 P.2d 1015 (1960) involved a case where the prosecuting attorney cross-examined the defendant for details concerning former convictions which the defendant denied, conduct which this Court does not condone and in fact the Attorney General in that case confessed error. Davis v. State, Okl.Cr., 413 P.2d 920 (1966) involved a situation where the court permitted the prosecuting attorney to repeatedly ask improper cross-examination questions and this Court found in that case that the verdict was in fact based on passion and prejudice and that the jury assessed the maximum sentence. Appellant also cited Hayes v. State, Okl.Cr., 397 P.2d 524 (1964) but apparently misread the holding in that case.

We have read the entire closing argument in view of appellant's contention and note that despite counsel's assertion that the argument was so prejudicial, he offered only two objections. At page 155 of the trial transcript, appellant's counsel objected to the District Attorney's third reference to the children:

"MR. JONES: If the Court please, I don't want to interrupt Mr. Carlile, but this bringing up these other six kids the third time seems highly improper to me. They're not on trial.

"THE COURT: Overruled and exceptions allowed. You may respond to that when you argue."

The objection was made in response to a statement by Assistant District Attorney Carlile that he wanted the jury to keep in mind the rest of those people around Gore and keep in mind the welfare of those other six little children that are there at home. In the closing portion of the argument, District Attorney Green made reference to defense testimony concerning stop-

ping and turning back in the pickup truck because Clifford thought they were about out of gas:

"* * * Now that's sillier than ever, 'cause they was about out of gas, and they were—I think it's about three and a half or four miles, not over four miles, from where they turned around they're still about the same distance from where they were going to eat, but they turn around and come back about fifteen miles and, you know, they never did stop and get any gasoline, never did. They passed filling stations in Webbers Falls, there's filling stations on the highways out there, they were about out of gas when they turned around, but they never did stop to get gasoline. Now, do you believe that story.

"MR. JONES: If the Court please, I want to say that Mr. Green, if he'll let his mind wander, knows there's not a service station between the town of Gore and the place they turned around, and I don't particularly like to get that in the record or interrupt him, but there's not any service station where he says there is." (Tr. 170)

That objection was likewise overruled.

■ This Court does not condone improper or prejudicial argument on behalf of the State and it appears the prosecution in this case may have strayed outside the record; however, the entire closing argument taken as a whole and considered in light of the evidence cannot be said to be prejudicial in this particular case. Insofar as appellant's argument concerning passion and prejudice, we note only that the jury assessed the minimum punishment allowable under the statute.

■■ Further, we wish to call attention to the long settled method used in this ju-risdiction for dealing with improper closing arguments. If counsel wishes to preserve in the record alleged errors committed during the closing argument of the State when an objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection together with a request that the jury be instructed to disregard the improper statement and in the event the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the motion for new trial. When this is not done, the matter cannot be presented for the first time in the motion for new trial and the petition in error and the briefs on appeal. In the event counsel for the defendant considers the remark so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error, counsel for the defendant should move for a mistrial and preserve this in his motion for new trial. Walters v. State, Okl.Cr., 455 P.2d 702 (1969).

■ The final assignment of error involves appellant's contention that the first three assignments of error collectively and cumulatively support the proposition that the case should be reversed. Inasmuch as we have found the first three assignments of error to be without merit, it follows that the fourth assignment is similarly without merit.

In addition to our consideration of the excellent briefs submitted by both sides and the authorities presented herein, a careful reading of the record and the transcript revealed no prejudicial error which would justify modification or require reversal. The judgment and sentence is hereby affirmed.

BRETT, J., concurs.