Alex **GLOVER**, Jr., **Appellant,**

v.

The **STATE** of Oklahoma, **Appellee.**

No. F–74–254.

Court of Criminal Appeals of Oklahoma.

Jan. 10, 1975.

Rehearing Denied Feb. 18, 1975.

Thomas Dee Frasier, David C. Cohernour, Legal Intern, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James D. Bednar, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Alex Glover, Jr., hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–73–1505, for the offense of Robbery with Firearms, After Former Conviction of a Felony; his punishment was fixed at a term of thirty-eight (38) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial Joseph Vandiver, a Tulsa policeman, testified that he responded to the report of an armed robbery at the Safeway Store on N. Peoria at 9:50 a.m. on August 13, 1973. At the scene he spoke with the store manager, Jerry Hunt, who gave him the description of three black males involved in the robbery, the description of a getaway car, and the car license tag number. Officer Vandiver also talked with two other eyewitnesses, Mrs. Carlene Minugh and Mr. Doug Bruffett, who gave similar descriptions of the assailants.

Doug Bruffett, a serviceman with National Cash Register Company, testified that he was repairing a checking machine in the cash checking booth when Manager Hunt told him to look at the three black

men who had just entered the store. He said they noticed the men because it had been raining that morning, yet all the men had on sunglasses. Bruffett said he went back to his work and that moments later, just as the manager was getting ready to open the door of the booth to leave, it was forced open and a black man, approximately 5′8″, stepped into the booth. He fired a shot from a small revolver held in his right hand and ordered Mrs. Minugh and the witness to sit on the floor. The witness said the robber had on denim pants, a jacket and a floppy hat, although he could not remember the color. He further said that he could not make a positive identification of the man because the robber had forced him to lie face-down during the robbery.

Store employee, Mrs. Carlene Minugh, testified that the robbery took place at 9:45 a.m. on August 13, 1973, while she was in the cash checking booth. The witness said that three black males entered the store through the south door and that two of them approached the booth. She said that one of the men forced his way into the booth, said "You've had it" and fired a weapon. The witness then identified the defendant as the man who had proceeded to rob the safe and the cash drawer.

On cross-examination, Mrs. Minugh admitted that at the police lineup, conducted on August 14th, the day after the robbery, she was unable to make a positive identification of the defendant, although she had said that the second man in the lineup, Alex Glover, Jr., looked like the man who had forced his way into the booth. She also admitted that her in-court identification was not absolutely positive, but that the defendant generally fit the description of the robber.

Next to testify was the store manager, Jerry Hunt, whose testimony was admitted after an èvidentiary hearing was held to determine the validity of his identification of the defendant as the robber. At trial, Mr. Hunt identified State's Exhibit #1 as resembling the gun used in the robbery. In recounting the incident, the witness said

that the defendant burst into the check cashing booth, cursed him, hit him in the side, and held the small black revolver with a white handle on him while he took the money from the booth. After the robbery he said the men fled out the east door of the store, which he later corrected to be the south door, and entered a 1961 gold Chevrolet, with the defendant and one of the men getting in the front seat and the other man in the back. Mr. Hunt said he followed them into the parking lot to get the license number and that someone fired shots at him from the front seat of the vehicle.

Tulsa Police Officer Gary Mullins identified the defendant as the man he arrested on August 15, 1973, and State's Exhibit #1 and #2, as the gun and bullets that were recovered from the car when the defendant was arrested. On cross-examination, Officer Mullins explained that another officer recovered the gun from the locked glove compartment in the car and that he himself could not say positively to whom the gun belonged. He further testified that the pistol was given to him by back-up Patrolman Ray Randolph who stated, in the defendant's presence, that the female passenger in the car at the time of the arrest had given him permission to search the glove compartment and that at this time the defendant made no comment on the conversation. Officer Mullins also testified that at the time he arrested the defendant it was not in connection with the Safeway robbery. Following his testimony, State's Exhibits #1 and #2 were admitted into evidence.

For the defense, Dr. Kerry Booth, director of the drug rehabilitation program at the Tulsa Psychiatric Center, testified that on August 13, 1973, he interviewed the defendant at 11:30 a.m. at a scheduled appointment. During Dr. Booth's testimony, defense Exhibits #3, #4 and #5, copies of pages from appointment books at the doctor's office, were admitted. Dr. Booth also testified that he had seen the defendant one other time, on August 10th, when they made the appointment for August 13.

Mrs. Lucy Self, the owner-operator of the T-Town Motel, testified that Alex Glover, Jr. and his wife Linda, were registered and staying at her motel during the period from August 8th to August 13th. During her testimony, defense Exhibits #6 through #11 were introduced. The exhibits were registration cards signed by the defendant or his wife for the period in August when they stayed at the motel and for several days in July when they had also been there. Mrs. Self testified that she did not see what time the Glovers left the motel on August 13th, but their usual practice was to leave at 11:00 a.m. and to lock the key in the room—not to bring it by the motel office.

The defendant's aunt, Mrs. Esther Teal, testified that she talked to the defendant on the phone at 9:30 a.m. on August 13th, when she called him at his room in the T-Town Motel. She testified that she was positive about the date and the time because she had called her nephew to remind him of the doctor's appointment and to invite him to her child's birthday party that afternoon. She said that during the course of the conversation, the defendant, who had been asleep when she called, asked her what time it was, that she looked at the clock and told him it was 9:30 a.m. On cross-examination, Mrs. Teal admitted that she could positively say where the defendant was at 9:30, but she could not say where he was at 9:45 a. m.

Mrs. Linda Glover testified that she and her husband were living at the T-Town Motel and identified the registration cards, Exhibits #6 through #11, as being those signed by her and her husband. Mrs. Glover said that on August 13th, she left the motel at 6:45 a.m. to go to her mother's house to get her daughter. She testified that she took her orange 1973 Firebird on the errand thus leaving her husband without transportation. The witness said she left her mother's house at approximately 9:15 a.m. and arrived at Mrs. Teal's house at 9:20, where she was to leave her daughter while she and her husband went

to his doctor's appointment. She testified that she arrived back at the motel at 9:50 just as her husband was getting out of bed. She said she waited for him while he showered and dressed and that they then left the motel to go to the appointment.

Mrs. Glover further testified that she was stopped by the police on August 14th and that they found a gun in the locked glove compartment of her car. She said that her husband did not know about the gun because it was hers. She testified that she had gotten it some two weeks before from a girl she met at a club who needed some money and offered to sell it for $10.-00. She said she had kept the gun in the glove compartment because she sometimes went out to clubs alone and was afraid. On cross-examination, Mrs. Glover asserted the policeman who found the gun did not have her permission to look in the glove compartment and that he unlocked it against her will. However, on re-direct examination, the witness admitted that when she got to the police station she signed a rights waiver giving the police permission to search her car.

Tulsa Police Detective Harold Harrison testified that he assisted with the lineup the defendant was in on August 14th. He said that after Mr. Hunt first viewed the lineup for five or six minutes, he came out of the lineup room and in answer to Officer Harrison's question of whether he saw anyone who was involved in the robbery, "He said, 'no, not really.' He said, 'Number 2 looks kind of like the man.'" (Tr. 366) Officer Harrison said that immediately after that he saw Officer Larry Johnson talking to witness Hunt, showing him a black, white-handled small revolver. A few minutes later when Harrison again talked to Mr. Hunt, according to the officer, Hunt said that after seeing the gun, he could say definitely that the Number 2 man in the lineup, Alex Glover, was the robber.

During an intense cross-examination, Officer Harrison said that he had not earlier reported the questionable lineup identi-

fication to the District Attorney's office because it was not his case and that he felt it would be improper to interfere in another officer's work. He also denied having made any reports whatsoever on the case.

Testifying in his own defense, the defendant alleged that he had never been in the Safeway store on Peoria, had nothing to do with the robbery, and that at the time of the robbery he had been at the T-Town Motel. He explained that although the registration cards at the motel showed that he drove a Ford, that he and his wife actually had only a Pontiac, but because he could not spell it, he had written "Ford." He testified to substantially the same facts as did his wife in recounting the morning of August 13th, alleging that he did not leave the motel until they checked out at 11:00 a.m. to go to the doctor. The defendant also gave an in-court handwriting exemplar introduced as Defense Exhibit #12, demonstrating that he was left-handed. He then showed the jury his left hand and arm which was covered by a large scar which he said he had had for almost 20 years. The defendant testified that he was not aware of the gun found in the glove compartment of his wife's car before it was shown to him by the police. He finally acknowledged that he had been convicted of two previous felonies stemming from 1966.

The State, in rebuttal testimony, called Officer Ray Randolph who testified that he assisted in the arrest of the defendant on August 14th. He said that when he arrived at the scene the defendant was sitting in Officer Mullin's car and that Linda Glover was standing outside the cars, crying. He explained that he talked with Mrs. Glover and got her permission to look in the glove compartment where he found a short-barreled .22 caliber revolver. He said that when he found the gun Mrs. Glover expressed surprise and also said that it was not hers. Officer Randolph said that on the way to the police station, Mrs. Glover had said: "I knew it, I knew it, my mother told me to stay away from Alex, that he's going to get me in trouble." (Tr. 422)

The next rebuttal witness to testify was Doris or Darie Selbert Monday, who testified to an alleged conversation he had overheard between the defendant and another cellmate while he was incarcerated with them in the Tulsa County Jail. Monday testified that he heard the defendant talking to an Otis Bagsby, also known as Otis Eugene Badgwell, telling Bagsby that he had pulled the Safeway robbery but that "they can't prove it." Monday also testified that he had served as a police informant one time in the past, but that he had not been promised anything by the authorities for his testimony.

Officer Larry Johnson testified that Detective Harold Harrison had been assigned to work with Officer Jerry McMillan on the lineup August 14th, and that the usual police procedure is that when there is some doubt as to the indentification made at the lineup, it should be noted on the report made on the lineup.

In surrebuttal testimony for the defense, the defendant testified that he had never had a conversation with Otis Bagsby concerning an armed robbery because he knew nothing about an armed robbery.

Otis Bagsby also testified that he had had no conversation with the defendant about the crime he was charged with, that in fact all he knew was that the defendant denied having done anything, and with his testimony the defense rested.

■ Defendant first contends that the Assistant District Attorney made repeated prejudicial remarks thus denying him a fair trial. The defendant cites numerous examples of comments made by the Assistant District Attorney during closing argument and questions asked during cross-examination of defense witnesses.

We have carefully reviewed the entire record and find that the complained of comments made by the Assistant District Attorney during closing argument were proper inferences and deduction to be drawn from the evidence and were based

upon the evidence. In the case of Wing v. State, Okl.Cr., 280 P.2d 740 (1955), this Court held in the fourth paragraph of the Syllabus:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoint the evidence and inferences and deductions arising from it. It is only when argument by counsel for the State is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

■ The defendant further contends under this proposition that the Assistant District Attorney asked questions of defense witnesses which violated the defendant's right to remain silent. In support of this contention, the defendant cites the case of Buchanan v. State, Okl.Cr., 523 P.2d 1134 (1974). It should be noted, at the outset, that this writer is in disagreement with the holding in that case. See dissent in Buchanan v. State, supra. However, the fact situation in the instant case is clearly distinguishable from that in the *Buchanan* decision.

The record, in the case at bar, reveals that the complained of cross-examination concerned the defendant's wife and aunt and not the defendant, whereas, the cross-examination in the *Buchanan* case dealt with the defendant's failure to make a statement prior to the trial. The following language: " . . . and the failure of her parents to come forward and make a statement prior to trial . . . .", as used by this Court in the *Buchanan* case was mere surplusage and not intended to extend the right to remain silent to third parties. Furthermore, we have determined that none of the Federal cases cited as authority for *Buchanan* have extended the right to remain silent to third parties. See United States v. Arnold, 425 F.2d 204 (10th Cir. 1970); United States v. Nolan,

416 F.2d 588 (10th Cir. 1969); and Deats v. Rodriguez, 477 F.2d 1023 (10th Cir. 1973). Therefore, we find that the privilege of a witness against self-incrimination is a personal privilege and the accused has no standing to invoke this privilege for a third person. We, therefore, find this proposition to be without merit.

■ Defendant's final proposition asserts the trial court erred in overruling the defendant's motion for new trial. The defendant, under this proposition, alleges that his conviction was obtained through inaccurate and fabricated testimony given by witness Monday. This Court has consistently held that the credibility of the witness is within the exclusive province of the jury. See, Fritts v. State, Okl.Cr., 487 P. 2d 1188 (1971) and Morris v. State, Okl. Cr., 489 P.2d 1092 (1971).

Finding no error sufficient to justify modification or reversal, it is our opinion that the judgment and sentence appealed from should be, and the same is hereby, affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.

BRETT, Judge (dissents):

I must respectfully dissent to this decision for the following reasons.

The opinion of the Court correctly distinguishes the facts of Buchanan v. State, Okl.Cr., 523 P.2d 1134 (1974) from those of the instant case for the reason that there is no violation of the Fifth Amendment privilege against self-incrimination here. Nonetheless, I believe the repeated questions put to defendant's alibi witness on cross-examination inquiring as to which police officer or which member of the District Attorney's staff she reported her information were highly improper and highly prejudicial and that the trial judge erred in failing to sustain the defense objection to those questions. Without doubt there are circumstances under which prior silence may amount in effect to an inconsistent

statement and hence may properly be used to impeach the testimony of a witness. Under other circumstances, however, silence may be so highly ambiguous that it lacks sufficient probative value to be shown as bearing on the credibility of the witness. See, Fowle v. United States, 410 F.2d 48, 50–51 (9th Cir. 1969). In Wigmore on Evidence, 3rd Edition, § 1042(3) that noted authority expresses the rule thus:

> "[M]uch depends on the individual circumstances, and in all [cases] the underlying test is, would it have been natural for the person to make the assertion in question?"

It is my opinion that under our adversary system of criminal justice the failure of an alibi witness to voluntarily notify either a police officer or a member of the District Attorney's office of the whereabouts of the accused on the date in question is too highly ambiguous to amount to a prior inconsistent statement or inconsistent conduct with which the witness may be impeached. Underhill's Criminal Evidence Volume 2, 5th Edition, § 443 flatly states that an alibi witness may not be impeached by a prior failure to inform the prosecuting attorney of the alibi:

> "A witness called to prove an alibi may be asked when his attention was called to the charge against the accused, and what was the date of the crime. He cannot, however, be asked, in order to impeach him, what he did to inform the prosecuting attorney of the whereabouts of the accused."

While this statement sweeps too broadly, the better rule appears to be that such a question cannot be put to the witness absent the laying of a proper predicate for such impeachment. In State v. Fletcher, 36 N.M. 47, 7 P.2d 936 (1932) that court stated:

> "But, before the omission to make a claimed important disclosure on a prior occasion may properly have this effect, [impairing the credibility of a witness] a

situation calling or furnishing the opportunity for such disclosure, or imposing the duty to make it, must have been shown to exist. Accordingly, the cross-examiner, before putting the impeaching question, must by his cross-examination at least make a prima facie showing as to time, place, and circumstance of the omission, on the prior occasion, sufficient to warrant the inference that the opportunity for disclosure and the duty to disclose existed." Id. at 938.

No such showing was made here. Under these circumstances, the witness' silence was not contradictory of her testimony at trial.

Similar tactics were used in the cross-examination of Detective Harrison who testified for the defense that Mr. Hunt, the Safeway Store employee, was unable to make a positive identification of the defendant during the lineup until after he had been shown a pearl handled pistol which had been taken from the automobile of defendant's wife. It is my opinion that that cross-examination also exceeded the bounds of propriety. In the cross-examination of both these defense witnesses the implication was clear that had they been telling the truth they would have early reported their information to the District Attorney and that if they had done that, the case against this defendant would have been dismissed. To that extent the prosecutor's conduct here is similar to the conduct disapproved in Dupree v. State, Okl. Cr., 514 P.2d 425, 427 (1973) in which the prosecutor made a similar implication during the course of his closing argument in an attempt to discredit the defendant's alibi witness.

Further, while it is true as the majority states that, "The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide," it is my opinion that the argument in this case exceeded that wide range. It is replete with improper remarks, among them a blatant appeal to the jury to ignore the instruction of the

court that they not allow sympathy or prejudice to enter into their deliberation:

"Ladies and gentlemen of the jury, while you're thinking about letting Mr. Glover go because the State has not proved its case, while you're thinking about that, you think about Mrs. Minugh, Mr. Bruffett and Mr. Hunt. You think about how they felt and the intimidation they went through out—(Tr. 536)

"And while, ladies and gentlemen, you're thinking about letting Alex Glover go—not only the intimidation that the witnesses went through down here on the floor with his gun, but the intimidation they have to go through when they take the witness stand, I'm surprised that a lot of them even report their robberies. So if you want to discount all of this, let Mr. Glover go. (Tr. 537)

\*    \*    \*    \*    \*    \*

"So when you're feeling sorry for Mr. Glover and you're saying, let me go, don't send me down to the penitentiary to live in a cage like an animal, well, think about the little people laying on the floor like an animal with their faces down." (Tr. 538)

It should be noted that this argument is very similar to that disapproved in Dupree v. State, Okl.Cr., 514 P.2d 425, 427 (1973), which case was reversed because of accumulation of prosecutorial misconduct. Also, although this case did not involve a shooting, the prosecutor referred on three separate occasions to finding a victim with a bullet through his head. (Tr. 531, 532) See, Lewis v. State, Okl.Cr., 493 P.2d 91 (1971), Holcomb v. State, 95 Okl.Cr. 55, 239 P.2d 806 (1952), in which cases similar comments were disapproved. Throughout the argument the prosecutor bolstered his powers of verbal persuasion by pointing the handgun introduced into evidence at the jury. (Tr. 491, 493, 533) On page 497 the transcript of the arguments reveals that the prosecutor informed the jury that his office declines cases if there is any doubt.

The conduct of the prosecutor increases in significance here because the case which the State built against Alex Glover, Jr., rests upon the shakiest of foundations. The first eyewitness, Douglas Bruffett, testified that he was unable to make any identification of the man accused of the robbery which he observed. The second eyewitness, Carlene Minugh, admitted on cross-examination that she was unable to make a positive identification of the defendant as the man who committed the robbery. (Tr. 148, 149) She also testified that she had been shown the gun in question during the course of the lineup after she was unable to make a positive identification. Of the identification made by the third eyewitness, Jerry Hunt, Officer Harold J. Harrison, a Tulsa Police Officer of 18 years' experience, testified that Hunt was unable to make a positive identification after viewing the men in the lineup and did so only after being shown the gun which had been taken from the car belonging to this defendant's wife. Concerning the testimony of Doris Monday, the cellmate who testified that he had overheard the defendant admit his participation in the robbery to Mr. Bagsby, E. Terril Corley, a Tulsa public defender, and Allen Smallwood, a law student working with that office, testified during the motion for a new trial in this case that they had spoken to Mr. Monday on another matter and that he had told them that someone from the District Attorney's Office had told him what his testimony should be in the Glover case.

I do not believe that justice has been served in this case, and upon the authority of Dupree v. State, supra, I would reverse and remand for a new trial.