Larry Eugene WRIGHT, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–399.

Court of Criminal Appeals of Oklahoma.

Jan. 21, 1975.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Ross N. Lillard, III, Legal Intern, for appellee.

Robert S. Durbin, Public Defender, Allen M. Smallwood, Legal Intern, S. Thomas Coleman, Jr., Asst. Public Defender, for appellant.

## OPINION

BUSSEY, Judge:

Appellant, Larry Eugene Wright, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–73–1131, for the offense of Robbery by Force or Fear, After Former Conviction of a Felony in violation of 21 O.S. 1971, § 791. His punishment was fixed at a term of ninety-nine (99) years imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness, Emanuel Leonard Hare, the owner of the Yale Drug Store located at 1348 North Yale, Tulsa, Oklahoma, testified that at approximately 7:40 p.m. on the evening of May 14, 1973, his store was hijacked. The only other individuals present in the store at the time of the robbery were an employee, Betty Jane Ford, and the robber. While relating the events that took place that evening, he stated that he heard a man holler out, "Polident, Polident, My old granddad," which prompted him to look up, at which time, he observed a man standing by the display rack at the back of the store. After glancing at the man for just a second or so, he went to the opposite end of the prescription department to pick up a typewriter. As he started to go out the back door to put the typewriter in his car, he observed Mrs. Ford and the man he saw at the display rack walking toward him. At this time, he saw a .38 snubnosed pistol pointed at him and the man told him not to move or he'd kill him. The man told him he wanted all of the narcotics saying, "If you don't do what I tell you, I'll kill you, " (Tr. 201). Thus, he got the narcotics out of the safe. He further testified that the man had Mrs. Ford by his side and was holding the pistol on her except when he would give Mr. Hare a command and then point the pistol at him. He stated that he never got a good look at the man's face because everytime he started to look, the man would say, "If you look in my face, I'll kill you." Therefore, he was unable to identify the defendant as the man who robbed his store. The man then ordered him to give him the money out of the safe. He told the man the money was not in the safe, but rather, in a drawer and got it out and put it in the box with the narcotics. He then was commanded to get the money from the two (2) cash registers. He testified that the total amount of money given to the man was four hundred and seven dollars ($407) and an undetermined amount of narcotics. He stated that the man held the pistol in his right hand and that he was not wearing gloves. After getting the money and the narcotics, the man ordered Mr. Hare and Mrs. Ford to lie down on the floor and not to get up for ten (10) minutes or he'd kill them. The man left and Mr. Hare called the police. When they arrived, he told them the man had picked up a carton of Polident tooth tablets, which they subsequently processed for fingerprints.

On cross-examination, he testified that the only things he saw the man touch were the Polident box and Mrs. Ford's back.

On redirect examination, he stated that he had not given the man permission to take the narcotics and money.

The State's next witness, Betty Jane Ford, testified that she had worked as a sales clerk at the Yale Drug Store. for about twelve (12) or thirteen (13) years. On the evening of May 14, 1973, at approximately 7:40 p.m., a man came into the store and walked over to where the Polident was and picked up a box and said, "Polident, Polident, My old granddad." Then the next thing she knew the man had her by the arm with a pistol to her side, saying, "Let's go to the back." She did as she was told and they went to where Mr. Hare was and the man put the pistol on him and told him to get the narcotics. As Mr. Hare started towards the back to get a box to put the narcotics in, the man said, "If you go out that door, she's dead," (Tr. 214). He kept telling them, "Don't move too fast or she's dead," (Tr. 214). She stated that after Mr. Hare gave the man the narcotics and all of the money, they were told to lie down on the floor and if either one of them get up within two (2) minutes they were both dead. After the man left, Mr. Hare called the police. At this point in her testimony, Mrs. Ford identified the defendant as the man who held the pistol to her side on the evening in question.

On cross-examination, she testified, that in order to enter the drug store, one had to push the front door open by using the handle. However, she did not see whether the man touched the door with his hands. She further stated that the only thing she saw

him touch was the Polident box. She testified that the man did touch her neck and shoulder but the police did not dust her clothing for fingerprints. The only thing they dusted was the Polident box.

At this point, she testified that she was called to view a lineup on June 15, 1973. She identified the officer who assisted her at the lineup as Larry Johnson, and stated that she did not have a conversation with him before viewing the lineup. After she was seated and looked down the line, she saw the man who robbed the store and told the officer she knew which one it was. The officer told her they had to go through the routine anyway. She stated that the men in the lineup were asked to put on wigs but the man who robbed the store was not wearing a wig. After viewing the lineup, she identified the defendant in position five (5), out of a total of six (6), as the robber. At this point, defense counsel showed her a picture of the lineup, Defendant's Exhibit No. 1, and she stated that the defendant was in position six (6) of seven (7) in the photograph. She then stated that she thought there were only six (6) in the lineup and she knew he was the one next to the end. She testified that she wears glasses but only for reading and was not wearing them the evening of the robbery.

On redirect examination, Mrs. Ford testified that she was basing her identification of the defendant on the fact that he was the man who had the pistol on them and threatened their lives on the evening in question.

Next, the State called Sergeant R. D. Wall to the witness stand. He identified State's Exhibit No. 2 as a Tulsa Police Department fingerprint card of rolled or latent prints of Larry Eugene Wright which he took on August 15, 1965, and which was signed by him. He further testified to the procedure followed when taking such prints.

In cross-examination, he testified that any residue left on the fingers before printing could destroy said print or prints.

On redirect, he stated that the prints contained in State's Exhibit No. 2 did not appear to be distorted in any manner.

The State's fourth witness was Officer Bill Yarborough. He testified that he was employed by the Tulsa Police Department in the Identification Division during the hours from 3:00 p.m. to 11:00 p.m. on May 14, 1973. After receiving a call, he went to the Yale Drug Store, arriving there at 7:40 p.m. While there, he processed a Polident box for latent fingerprints. He stated that he did not process or dust anything other than that box. He identified State's Exhibit No. 1 as the top of the Polident box on which was found a legible fingerprint. He stated that there were other prints on the box but that they were not identifiable.

On cross-examination, he related that he did not dust the door because other people had handled it and that he didn't dust Mrs. Ford's clothing as he did not have the proper equipment to do so.

The State's final witness, Officer Don Lovins, testified that he was employed by the Tulsa Police Department in the records and identification division. He testified that on June 15, 1973, he had occasion to make a comparison of the latent prints in State's Exhibit No. 1 with the known prints in State's Exhibit No. 2. He identified State's Exhibit No. 3 as a blow-up of State's Exhibit Nos. 1 and 2 placed side by side on a card. As a result of the comparison, he testified that he found approximately twenty (20) points of identification between State's Exhibit Nos. 1 and 2. He stated that the latent print matched that of the rolled print. At this time, the State rested its case.

The defendant called Joyce Faye Wright as his first witness. She testified that she is the wife of the defendant, and that on May 14, 1973, she took her husband to work in the morning and then went to work herself. She left work that afternoon at 4:30 p.m. and picked her husband up at his place of employment and proceeded home. They arrived home around 6:00

p.m. or 6:30 p.m. This was approximately the same time that Mr. and Mrs. Ronny Younger, friends of theirs, arrived at their home to eat dinner. She testified that the four (4) of them sat around, drank a little Boone's Farm and some beer, played some records, and watched television. The Youngers left between 10:00 p.m. and 10:30 p.m. and she remembered this because the news was on the television. After the Youngers left, she and Larry went to bed around 11:00 p.m. She stated that Larry did not leave the house at anytime that evening. She remembered the day of May 14, because she had just returned to her job the previous Friday of May 11, after having taken off work due to her father suffering a heart attack. She further related that her lower teeth were false and that on occasion she used Polident cleanser and her husband would buy this for her.

On cross-examination, she testified that she and Larry were married on May 26, 1973. She had known Ronny Younger for about two (2) or three (3) years and Mrs. Younger for about one (1) year. She indicated that the Youngers were good friends and that she had told them, at a time uncertain, that her husband had been arrested. She had never been either by herself or with her husband to the Yale Drug Store. In response to a question as to why she had not come forward prior to trial to tell her story, she stated that a lawyer and her father told her not to say anything until the trial.

The defendant's next witness, Ronald Younger, testified that on May 14, 1973, he and his wife went to the home of Larry and Joyce Wright to pick up a piece of furniture and have dinner. The remainder of his testimony on direct examination, concerning the events of the evening in question, substantially corroborated that of Joyce Wright. He stated that he remembered that night well because the next morning his wife's pregnancy was confirmed by the doctor and he did not believe it was his child.

On cross-examination, he testified that, as of May 14, 1973, he had known the defendant for approximately two (2) months and that he was not aware that the defendant had been charged with a serious crime until just a few days before the trial.

The defendant's third witness, Billie Marlene Younger, testified to substantially the same facts as Joyce Wright and Ronald Younger as well as confirming her husbands testimony relating to her pregnancy and their marital problems. She stated that she and her husband were now separated.

On cross-examination, she testified that she had known Joyce Wright since the first part of 1973 and that she had lived with Joyce in July after her separation from her husband. She stated that she had not contacted anyone in law enforcement, prior to the trial, to tell her story because she had previously worked for an attorney and always felt that, unless someone asked, one should not volunteer. Also, she did not want to get involved as she had problems of her own.

The defendant was the final witness to take the stand on his behalf. He testified to substantially the same facts concerning the evening of May 14, 1973, as did Joyce Wright, Ronald Younger, and Billie Marlene Younger. He stated that he never left the premises from the time they arrived home from work until the next morning. He further testified that he had been in the Yale Drug Store maybe two (2) times before May 14, 1973, but that he was not there on May 14, 1973. He stated that sometime in the first part of May, before the fourteenth, he went into the Yale Drug Store with a woman named Angie Winters and her young son to purchase a few items. He said he did not tell any law enforcement officers that he was not in the drug store on the fourteenth because his lawyer told him not to discuss it with anyone.

On cross-examination, he testified that he did not own a gun of any kind. He further stated that he thought he was

in the drug store with Angie Winters on the seventh of May, because he went to Texas later that day. He did not purchase any Polident on that visit and could not remember if he touched any Polident containers at that time. He related that he did not know where Angie Winters lived at the time of the trial. In response to a question concerning how his fingerprint got on the Polident box, he replied that he probably handled the box during his visit to the store on the seventh. He could not account for the identification of him, the robber, by Mrs. Ford. When asked if he ever used narcotics, he stated that he had but that he quit around the first of May and was not using them on May 14. He testified that he had been convicted of second degree burglary in 1967 and received an eight (8) year sentence and also of second degree burglary in 1966. At this point, the defense rested.

The defendant's first assignment of error alleges that the trial court should have quashed the in-court identification of the defendant by Mrs. Ford. In support of this contention, it is asserted that due to a discrepancy in testimony, regarding defendant's actual position in the lineup, he was denied due process.

■ A lineup must be conducted in such a manner as to prevent unfairness and to insure that an in-court identification is independent in origin from the eyewitness confrontation at the lineup. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

■ After a careful review, we find that the record of the evidentiary hearing (Jackson v. Denno) indicates that the defendant was represented by counsel at the lineup, that correct standards were followed in the makeup of the subjects in the lineup and that there was no suggestion as to any one participant in the lineup. Furthermore, the trial transcript indicates that the basis for the in-court identification of the defendant was a direct product of observations during the commission of the crime charged.

In identifying the defendant in the courtroom, Betty Jane Ford testified (Tr. 229):

"Q. Mrs. Ford, what are you basing your identification on, today, for the Court and the jury?

A. That he was the man that had the gun on us and threatened our lives that night.

Q. This man seated over here with counsel?

A. Yes, sir."

Therefore, the record establishes that there was an independent origin to the in-court identification. Accordingly, we hold that the guidelines for determining admissibility of a courtroom identification, as set out by this Court in Thompson v. State, Okl.Cr., 438 P.2d 287, were substantially complied with and further, that the discrepancy complained of was minor and that the defendant was not denied due process in the manner of which he complains.

■ The defendant's next allegation asserts that the trial court erred in allowing the prosecutor to inquire into defendant's prior convictions on cross-examination of defendant as such convictions were illegal on jurisdictional and constitutional grounds and therefore void. In support of his argument, the defendant contends that the sentencing court which imposed the judgment and sentence on defendant in Case No. 22793 in Tulsa County lacked authority under the law to pronounce said judgment and sentence. The reason being that the sentence is contrary to and in excess of the jurisdiction of the sentencing court as provided in 21 O.S.1961, §§ 51, 1435, and 1436. With this contention, we cannot agree.

In the above cited case, defendant was sentenced October 3, 1967, on a plea of guilty, for the offense of second degree burglary, after former conviction of a felo-

ny and received a sentence of eight (8) years imprisonment. The pertinent part of 21 O.S.1961, § 1436, is:

"Burglary is punishable by imprisonment in the penitentiary as follows: . . . 2. Burglary in the second degree not exceeding seven years and not less than two years."

The pertinent part of 21 O.S.1963 Supp., § 51, as amended in 1963 and distinguished from the present statute which is the result of an amendment in 1968, provided as follows:

"Every person who, having been convicted of any offense punishable by imprisonment in the penitentiary, commits any crime after such conviction, is punishable therefor as follows:

1. If the offense of which such person is subsequently convicted is such that upon a first conviction an offender would be punishable by imprisonment in the penitentiary for any term exceeding five years, such person is punishable by imprisonment in the penitentiary for a term not less than the minimum of number of years authorized for a first conviction."

Therefore, it is apparent that the defendant upon being convicted of the above offense could have been sentenced to a term of any number of years so long as it was not less than two (2) years. Accordingly, the sentence of eight (8) years received by the defendant was well within the jurisdiction and authority of the sentencing court and thereby valid in all respects.

█ The defendant further asserts in this proposition that the trial court committed reversible error in allowing evidence of a prior felony conviction to impeach the defendant's credibility and to enhance his punishment. In support of this argument, the defendant relies on the decision of the Tenth Circuit United States Court of Appeals in Lamb v. Brown, 456 F.2d 18. Suffice it to say that this Court has ruled on this issue in the recent decision of Pollard v. State, 528 P.2d 1121 (Okl.Cr., 1974), in which it was said:

"Defendant's second proposition of error asserts that it was error to permit the use of his former conviction in Stephens County District Court Case No. CRF–70–100, because of the 10th Cir.Ct. of Appeals decision in Lamb v. Brown, 456 F.2d 18 (1972), in that defendant was 17 years old at the time he sustained that conviction. In support of his contention, defendant cites as authority the 10th Cir. Ct. of Appeals unpublished Order in the matters of Radcliff v. Anderson, No. 73–1520, and Stringfield v. Grider, No. 73–1550, wherein that court held that the Lamb decision was to be fully retroactive. This Court can take judicial notice of the fact that those unpublished orders have been withdrawn and are now pending on rehearing before the 10th Circuit Court of Appeals. This Court has heretofore held that Lamb v. Brown, supra, will not be applied retroactively. Defendant requests that this decision be held in abeyance until the 10th Circuit Court of Appeals reconsiders the *Radcliff* and *Stringfield* matters; but after considering the merits of this conviction, insofar as the evidence is conclusive concerning defendant's guilt for the charge of burglary, we decline to grant defendant's request in this respect. However, should the U. S. Court of Appeals hold that the Lamb v. Brown, supra, decision is to be applied retroactively, defendant will not be precluded from seeking further relief under the post conviction relief procedures."

Also, see Rutledge v. State, 527 P.2d 1393 (1974). Accordingly, we find this proposition to be without merit.

██ The defendant's third assignment of error alleges in part that the trial court erred in allowing certain comments made by the prosecutor during the trial concerning Mrs. Wright's failure to come forward with her testimony prior to trial (Tr. 300), thus depriving defendant of his Fifth

Amendment right to remain silent. In support of this contention, defendant cites the case of Buchanan v. State, Okl.Cr., 523 P. 2d 1134 (1974). It is readily apparent, however, that the base at bar is distinguishable, in that the *Buchanan* case dealt with the improper cross-examination of the defendant herself whereas here the cross-examination was directed toward the defendant's wife. We have held that the privilege of a witness against self-incrimination is a personal privilege and the accused has no standing to invoke this privilege for a third person. See our recent decision in Glover v. State, Okl.Cr., 531 P.2d 689 (1974).

■■■ The defendant further contends that the trial court erred in allowing the prosecutor, in his closing argument, to refer to defendant's failure to produce a certain potential defense witness (Tr. 402). After careful examination, we have determined that the prosecutor properly pursued and made a logical inference from the evidence brought out at trial. It has several times been held by this court that where a person might be a material witness in his behalf, and he is not placed upon the stand by the accused, nor his absence accounted for, failure to produce him as a witness is a legitimate matter for comment in the argument of the state. See Hilyard v. State, 90 Okl.Cr. 435, 214 P.2d 953 (1950). Furthermore, we have consistently held the right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising therefrom. It is only where argument by counsel of the State is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based upon improper argument. See Noble v. State, Okl.Cr., 497 P. 2d 452 (1972).

■■■ The defendant's fourth assignment of error alleges the trial court erred in allowing the prosecutor to inquire of the defendant on cross-examination whether he had used drugs. As applied to the fact situation of the instant case, we are inclined to believe this was proper as going to show a motive for the crime for which he was charged. This Court, on numerous occasions, has held that evidence of other offenses is generally inadmissible unless it is material and proper to show motive, intent, absence of mistake or accident, identity of person charged with commission of crime for which an accused is put on trial, or common scheme or plan embracing two or more crimes so related to each other that proof of one tends to establish the other. See Vanderpool v. State, Okl.Cr., 501 P.2d 871 (1972).

■■■ The defendant's fifth assignment of error alleges the trial court erred in refusing to give defendant's requested instructions, numbers one through six. It has been repeatedly held that it is not error to refuse requested instructions which are proper statements of law, when such requested instructions are substantially covered by the instructions given by the court. See Wixon v. State, Okl.Cr., 527 P.2d 333 (1974). In the case at bar, we find the defendant's requested instructions were substantially covered by those given by the Court. Furthermore, we find that the court's instructions, when considered as a whole, fully and correctly stated the applicable law. See Trowbridge v. State, Okl.Cr., 502 P.2d 495 (1972).

■■■ The defendant's sixth assignment of error asserts that the case be reversed because the accumulation of errors, when considered as a whole, deprived him of a fair and impartial trial. In Haney v. State, Okl.Cr., 503 P.2d 909 (1972), this Court held that if the previous propositions of error are without merit, it follows that the proposition which asks that the pre-

vious propositions be considered collectively, would also be without merit. In the instant case, since we have found the first five propositions of error to be without merit, it follows that this sixth contention is similarly without merit. See Glover v. State, Okl.Cr., 524 P.2d 51 (1974).

■ The defendant's final assignment of error alleges that the sentence imposed was excessive and should be modified should reversal not occur. Due to the nature of and the circumstances surrounding the crime involved, we need only observe that the punishment was within the range provided by law, and does not shock the conscience of this Court. See Turner v. State, Okl.Cr., 479 P.2d 631.

For the above and foregoing reasons, the judgment and sentence appealed from is affirmed.

BLISS, P. J., concurs.

BRETT, J., concurs in part and dissents in part.

BRETT, Judge (concurring in part and dissenting in part).

I concur that it was within the province of the jury to find defendant guilty of the charge, but I dissent to the use of defendant's former conviction sustained when he was seventeen years of age, and I believe the punishment is excessive. I reiterate my position with respect to Lamb v. Brown, supra, in that I believe that decision went to the jurisdiction of juvenile matters and therefore I believe it should be construed to be fully retroactive. Likewise, it shocks my conscience to impose a sentence of ninety-nine (99) years imprisonment on the facts presented in this case.